## CARRUTHERS et al. v. REED, Keeper of Arkansas State Penitentiary. *
### No. 11210.

Circuit Court of Appeals, Eighth Circuit.

Feb. 25, 1939.

*Rehearing denied March 25, 1939.

John A. Hibbler and J. R. Booker, both of Little Rock, Ark. (Scipio A. Jones, of Little Rock, Ark., on the brief), for appellants.

John P. Streepey, Asst. Atty. Gen. (Jack Holt, Atty. Gen., and Millard Alford, Asst. Atty. Gen., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

The appellants, Jim X. Carruthers and Bubbles Clayton, are negroes who were convicted in the Circuit Court for the Chickasawba District of Mississippi County, Arkansas, of the crime of rape and sentenced to be executed. They appealed from the sentence to the Supreme Court of Arkansas and that court considered all questions presented, reviewed the evidence and found it substantial and sufficient and affirmed the judgment. Clayton v. State, 191 Ark. 1070, 89 S.W.2d 732. On petition for rehearing the Supreme Court handed down a further opinion in which it reiterated its conclusion that the evidence in support of the conviction was substantial, direct and positive, and the petition for rehearing was denied. Habeas corpus was then applied for in the Federal District Court on the grounds: (1) that the trial was dominated by mob violence which prevented a fair trial; (2) that negroes were systematically excluded on account of their race from the panel of the grand jury which found the indictment and of the petit jury which rendered the verdict; (3) that a change of venue was prevented because of the mob spirit dominating the district and county in which the trial was held. It was alleged that appellants had been denied due process of law "in contravention of the 5th and the 14th Amendments to the Federal Constitution, U.S.C.A." The State joined issue upon the petition for habeas corpus by answer.

On the hearing for the writ it appeared to the District Court that the grounds upon which invalidity of the judgment was asserted had not been presented to or passed upon by the state courts and the habeas corpus proceedings were stayed because state court remedies had not been exhausted. Under the Arkansas rule, where a case has been before the Supreme Court, permission to apply to the court of first instance for a writ of error coram nobis must first be obtained from the Supreme

Court. Application for such permission was accordingly made to the Supreme Court, 112 S.W.2d 1115, and denied by it without opinion. The petition for habeas corpus in the Federal court was amended to show such application and the denial thereof, and trial was had upon the petition for habeas corpus as amended. The writ was denied and the District Judge having made certificate of probable cause (28 U.S.C.A. § 466), this appeal was taken.

The question for this court is whether the appellants were denied due process of law or the equal protection of the law by the procedure in the state courts under which they are now held for execution of the death penalty.

■ The decisions of the Supreme Court have firmly established that a prisoner in custody pursuant to the final judgment of a state court is entitled, on petition for habeas corpus in the federal court, to have "judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, although it may become necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to a judgment against him. * * * It is open to the courts of the United States * * * to look beyond forms and inquire into the very substance of the matter * * *." Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461.

■ Here there is no claim of defect in the statute defining the crime for which appellants were convicted or in the form of the indictment against them or for want of general jurisdiction in the courts where they were tried or to which their appeal was taken. But the provision of the 14th Amendment to the Federal Constitution that no state shall "deprive any person of life, liberty, or property, without due process of law" constitutes a continuing guarantee by the federal government against conviction or punishment for crime by any state without a fair and impartial trial accorded the accused. If the trial of these appellants was in fact dominated by mob violence so that there was an actual interference with the course of justice, then there was a departure from due process of law in the proper sense of that term. If the state, supplying no corrective process, carries into execution a judgment of death or imprisonment based upon a judgment produced by mob domination, the state deprives the accused of his life or liberty without due process of law. Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L. Ed. 969; Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543. We have, accordingly, carefully examined the evidence and the proceedings to determine whether in truth and in fact there has been a fair and impartial trial according to law.

■ The petition for writ of habeas corpus includes some fourteen affidavits attached and made a part thereof and the record includes testimony given orally by numerous witnesses on the hearing of the petition for the writ as well as the proceedings and evidence upon the trial under the indictment.

It appears that on January 12th, 1935, Clarence H. Wilson, sheriff of Mississippi County, Arkansas, was shot and severely injured and on the same day the appellants were arrested for the offense at Blytheville, the county seat of the county. The shooting and the arrest aroused excitement in that community at the time and the officers took the precaution to remove the prisoners from the community. The record does not show any overt acts or threats or demonstrations made against the prisoners at Blytheville, but the action of the officers was a prudent precautionary measure. They took the prisoners first to Osceola, Arkansas, and then to Memphis, Tennessee, and then to the State Penal Farm at Tucker, Arkansas, where they confined them in a cell referred to as a death cell. Later the prisoners were returned to Blytheville and were lodged in the jail there without molestation for a period of about six weeks prior to their trial.

On the night of December 21, 1934, a white woman named Virgie Terry was raped by two negroes. She and a young man named Wiley Bryant were sitting in a parked car on the road about a mile and a half southeast of Blytheville and were subjected to assault with force of arms by two men who committed the rape while Bryant was forced, at the point of a gun, to lie in an adjacent ditch. Although the crime was committed at night and handkerchiefs were used to cover the lower part of the faces of the men who committed it, there was some moon light and light from automobiles which passed by, and Virgie Terry saw the faces of both of the men during the commission of the rape.

On about March 15, 1935, Virgie Terry and Wiley Bryant went to the State Penal Farm at Tucker where the appellants were confined and having been admitted to the corridor between the cells where the prisoners were in view, they identified the appellants as the men who had assaulted them and who had committed the rape upon Virgie Terry on the night of December 21, 1934.

On April 1, 1935, the grand jury returned an indictment in the Circuit Court of the Chickasawba district of Mississippi County, Arkansas, charging them with the rape upon Virgie Terry.

On the first day of the term of court the presiding judge appointed Mr. Arthur L. Adams, an attorney of Jonesboro, Arkansas, to defend the appellants and set the case for trial a week later. The judge testified that the custom in the court permitted the appointment of the younger lawyers to defend accused persons in the ordinary cases against indigent defendants, but he deemed the present case to be of serious importance. He did not think that an attorney residing in Mississippi County should undertake the defense. Mr. Adams had previously lived and practiced his profession at Blytheville and was an experienced and competent lawyer. He accepted the appointment and on the same day went to the jail and talked to the appellants and got the names of people he should see in the preparation of the case. He put in all of his time up to the trial in the preparation for the defense, excepting two days spent at the hearing of a case in Little Rock. His testimony concerning the trial is extended to all the particulars of his action as attorney for the defendants. It reflects his full appreciation of his responsibility and that he put forth his best effort to discharge it faithfully. There is nothing in his testimony to indicate that he was affected or disturbed by any thought of mob influence. Although the court room was crowded so that the court admonished that the aisles be kept clear, he did not consider the crowd out of the ordinary in that country on the trial of a serious offense. His recollection was that colored folks were in the gallery of the court room. He said, "My attention was centered on the trial of the case and I did not think of the crowd." He was not interrupted by any disturbance and recalled no disorder in the court room and was evidently untrammeled in the examination of witnesses and presentation of his contentions and arguments for the defendants.

The trial judge also testified at length and his testimony convinces of his earnest purpose to accord the accused a fair and impartial trial. He remembered that the balcony of the court room was crowded with negroes during the entire course of the trial. The audience was no greater than was usually to be expected in that locality at the trial of such a serious offense. The judge testified that nothing happened at the trial that led him to believe that undue influence was brought to bear upon the jury that caused them to do what they did, and if he had that thought that anything improper reached the jury he would have declared a mis-trial, whether popular or unpopular.

Two witnesses who had served as jurors upon the trial testified that before they qualified as jurors their minds were open and they were unbiased. They knew of nothing, either before or at the trial, to cause them to fear mob violence or to be excited in any way.

Officers who attended the trial also testified that there was no sign or threat of any mob violence, but that the trial was conducted in a quiet and orderly manner. There were also witnesses who had attended the trial as spectators and they observed no evidence of any menace or threat of mob violence.

On the other hand, the affidavits submitted by the applicants for the writ contain the conclusion of the witnesses stated in general terms that the trial of the case was dominated by a mob. There are also affidavits to the effect that the newspapers published at Blytheville were highly inflammatory. This is denied by the managing editor of the Blytheville paper. The papers were introduced in evidence, but are not brought before this court in the record.

A witness testified on behalf of the petitioners for the writ that the atmosphere was full of violence; that if the defendants weren't stuck, "I don't know what would have happened." On cross examination, however, he testified that he didn't hear any talk, "particularly of hanging", but "the atmosphere was full of talk." He testified "there was a man up at Holland's that made a lot of talk. That is a short ways up in Missouri." However, he did not attend the trial, but said: "I was up there a little time that morning, * * * The court room was quiet. I could not

state that they had a fair and impartial trial. It might have been and might not, because of fear that if they did not make the decision an electrocution or death, it would be done by mob. That was the general supposition. The general public around—being talked. I don't know how I could state right exactly and be positive about one man, just general talk."

One incident is given great importance by the appellants. The jury deliberated some three or four hours and came in and requested additional instructions, and while the record made is not before this court, it appears that they were considering whether they should recommend capital punishment or less. At about ten o'clock in the evening the jury also indicated to the court that they could not get together that night and asked to be excused until the next day. The judge asked them to retire for a little to the jury room. Some person unidentified except that the witness stated that he believed it was a deputy sheriff, came back to the chambers where the judge, the prosecuting attorney and defendants' attorney were assembled and told the judge not to permit the jury to retire for the night, because if the court did so he was afraid he would not be able to get the boys back to the jail. Nothing regarding the communication or idea appears to have been transmitted to the jury.

This statement ascribed to an unidentified person stands almost alone against the convincing evidence that the trial was carried on in an orderly and proper manner under no constraint by any mob menace or fear. The presence of negroes reflected an absence of racial threat or menace. The jury manifested its sense of freedom from coercion or fear by carrying on its deliberations between three and four hours. It would have been unusual for the court to have excused them from further deliberation at the time the statement is said to have been made, and it could not be inferred that the court was in anywise moved to his refusal to excuse the jury on account of the statement. His testimony excludes such a possibility. The statement was equivocal, standing alone, and leaves to conjecture what the one who made it may have had in mind. It was not competent to establish facts which would justify the granting of the writ of habeas corpus.

Upon an appeal in a habeas corpus case, all questions of law or fact arising upon the record, including the evidence, are open to consideration and the trial court has no authority to make conclusive findings of fact as in actions at law, waiver of a jury or in cases of admiralty. Johnson v. Sayre, 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914. Our conclusion upon the whole evidence is that while some excitement and feeling against the appellants was aroused in Blytheville in January, 1935, at the time the sheriff of the county was shot and taken to the hospital, there was no mob violence, either overtly manifested, threatened or feared at the trial of the accusation against them nearly three months later, but that said trial was conducted in a fair and orderly manner. Although we are not bound by the conclusions of the trial judge, we observe that having the witnesses before him and being intimately familiar with local conditions, he made the following finding: "That the evidence failed to show that there was mob violence dominating the court or jury at the trial of petitioners before the Circuit Court of Mississippi County, Arkansas; that the proof shows the petitioners were lodged in the county jail of Mississippi County all of the time for six weeks prior to the date of their trial, and no one molested them or used violence towards them; that no persons were searched for weapons on the days of trial; that the balcony in the trial court room was filled with negroes attending and listening to the trial during the entire two days of the trial, and that the jury considered its verdict for over three hours."

■ II. There is substantial evidence that negroes had been systematically and intentionally excluded from the panels of both the grand jurors and petit jurors in Mississippi County over a period of years, although there were among the population many persons of that race qualified for such service under the Arkansas statutes. [1] It is also shown that there were no negroes upon the grand jury which returned the indictment against these appellants nor upon the petit jury which returned the verdict against them. It is settled by the decisions

---

[1] Grand Jurors, Electors of the county —of good character, or approved integrity, sound judgment and reasonable information. Must be an elector and citizen of the County, temperate and of good behavior.

Petit jurors, They must possess the same qualifications as enumerated for grand jurors. Pope's Digest of Laws of Arkansas, Vol. 2, Secs. 8312–8314.

of the Supreme court that " 'Whenever, by any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the 14th Amendment of the Constitution of the United States.' Carter v. Texas, 177 U.S. 442, 447, 20 S.Ct. 687, 44 L.Ed. 839, 841; Strauder v. West Virginia, 100 U. S. 303, 25 L.Ed. 664; Neal v. Delaware, 103 U.S. 370, 397, 26 L.Ed. 567, 574; Gibson v. Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L. Ed. 1075; Rogers v. Alabama, 192 U.S. 226, 231, 24 S.Ct. 257, 48 L.Ed. 417, 419." Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497.

But the record in this case discloses that the attorney, Mr. Adams, in conducting the defense for the appellants, was fully advised and gave careful consideration to the fact that negroes had been and were excluded from the jury panels. He was also familiar with the decisions of the Supreme Court affirming the rights of the appellants under the equal protection clause of the Federal Constitution on account of the exclusion of persons of their race from the jury panel. He considered whether or not he should raise the point by motion to quash the panel and decided, after deliberation, not to do so. From the record it appears that this decision was influenced by two considerations: First, it might prejudice his clients; and secondly, he seems to have felt that the jury panel was favorable, that is, as he expressed it, "a very good jury." During the years he had lived in Blytheville he had become acquainted with and knew some of the men on the jury. He had lived in the home of Charles Gray, one of the jurors on the panel, for a time when he was in Blytheville, and their relations had been most cordial. Another man named Frank Webb was on the jury and he knew him as a good man. There was another man on the jury who had been one of his neighbors when he lived in Blytheville, and he knew him very well and was very cordial to him. The prejudice to his clients that he feared was not any mob violence or that he himself was in fear, but as he expressed it, "I really felt that a motion of that sort would be merely a technical matter, which would rather prejudice the minds of the people than do me any good in that actual trial. I really think that was the question I

had in mind in not filing that motion because I felt it would result in this, that even granting there might be some colored folks put on the panel, they would certainly be stricken promptly in choosing of the jury and in the end none would profit from it, unless it was just on that technical situation, to have the motion of sort in that record and for that reason the motion was not made."

The matter of appellants' right to raise objection to the panel on that ground was also considered and discussed before the presiding judge who testifies that if such objection had been filed he would have done his best to comply with the ruling of the Supreme Court, as he had done on every occasion where the point had been raised. He recalled that he had had occasion to have negroes on his juries in at least two instances. But the final decision of Mr. Adams indicated to the judge that it was for the best interest of his clients not to raise the question and not to have any negroes on the jury.

■ Where parties, even in a criminal case, knowingly and deliberately adopt a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time, after a decision has been rendered adverse to them, to obtain a retrial according to procedure which they have voluntarily discarded and waived. Johnson v. Zerbst, supra, syl. 2, page 458, 58 S.Ct. page 1019. Full opportunity having been afforded the appellants to apply to have the jury panel quashed and to have negroes summoned on a new jury panel, they could not deliberately withhold their application for such procedure and then be heard after conviction to assert on habeas corpus that their conviction was void. Such is not the function of the writ of habeas corpus. In the situation presented there was no denial of judicial remedy; therefore there was no denial of equal protection nor of due process of law. The decision of their counsel learned in the law, an attorney of judgment, experience and discretion, that their interests would not be furthered by filing the application, was binding upon the appellants and no inference can be drawn in view of the testimony on the trial that there was even a mistake of judgment chargeable to the attorney.

■ Under the law of Arkansas a challenge to the panel or motion to quash must be promptly made and it is too late if the jury has been empanelled and sworn.

Brown v. State, 12 Ark. 623 (See 35 C.J. 377). If no objection was made at the trial, it is too late to urge it for the first time after verdict.

The right to challenge the panel is a right that may be waived and is waived if not seasonably presented. Such rights, if waived during trial, may not be availed of by attack, in a collateral proceeding. Bracey v. Zerbst, 10 Cir., 93 F.2d 8.

In this case, the writ is not aided by the application which was made for the writ of error coram nobis. The office of that writ in Arkansas is to correct an error of fact in respect to a matter affecting the validity and regularity of the proceedings in the same court in which the judgment was rendered, and where the record is, when the error assigned is not for any fault of the court; those errors which precede the judgment, as errors in the process, or through default of the clerk; where an infant appears by attorney and not by guardian; where the defendant was insane at the time of the writ, or died before judgment. It has been sustained where the defendant was induced to plead guilty to a charge of felony through fear and by reason of the threats of a mob. But it will not lie to contradict or put in issue any fact that has been already adjudicated in the action. Howard v. State, 58 Ark. 229, 24 S. W. 8. If a fact is known at the time of the trial and not taken advantage of at the trial, the defendant cannot obtain relief by writ of error coram nobis. Bass v. State, 191 Ark. 860, 88 S.W.2d 74; State v. Hudspeth, 191 Ark. 963, 88 S.W.2d 858; Sease v. State, 157 Ark. 217, 247 S.W. 1036; Kelley v. State, 156 Ark. 188, 246 S.W. 4. Petitioners waived their right to review the judgment of the state court in the regular manner, and habeas corpus in the circumstances cannot be substituted for such review. Goto v. Lane, 265 U.S. 393, 44 S.Ct. 525, 68 L.Ed. 1070; Riddle v. Dyche, 262 U.S. 333, 43 S.Ct. 555, 67 L.Ed. 1009; Craig v. Hecht, 263 U.S. 255, 44 S.Ct. 103, 68 L.Ed. 293.

III. We assume without express decision that where an accused is prevented from obtaining a change of venue by manifestations of hostile public sentiment against him which makes it impossible to obtain affidavits required by the statute, a basis might be thereby afforded for a writ of habeas corpus. The Arkansas statutes require a petition for change of venue to be supported by the affidavits of two credible persons, qualified electors and actual residents of the county. Sec. 3088, Crawford & Moses' Digest. The attorney for the defendants at the trial procured one signer but testified at the hearing for the writ that he could not get a second signer. He said those who refused to sign did so on the ground they might be embarrassed later. When asked if they expressed feeling against the defendants, he said: "Well, that is a question that is a little more difficult to answer. You can sometimes infer more from the attitude of the person than you might get from their actual statement. * * * Well, their attitude was that they thought the boys would get justice, but you were left to infer what that justice would be."

The Chickasawba district is a large district of Mississippi county. The attorney testified that in making the attempt to get a second signer, he did not go outside of Blytheville any great distance, because he did not have time. To the question asked him, "Then you could not say of your own knowledge that you could not have obtained the requisite signers to that affidavit had you—if you had—by going out and contacting the people in the district as a whole?", he answered, "Well, I could not say that because I was never beyond Little River on the west."

J. R. Godwin, who made the affidavit in support of the petition for change of venue, made an affidavit on the application for writ of habeas corpus that after he had signed the affidavit for change of venue, setting up that, because of the inflamed and prejudicial state of mind, the defendants could not obtain a fair and impartial trial in Mississippi county, he was severely criticised and felt that he would suffer in influence and perhaps otherwise, for having signed the affidavit and so expressed it to the attorney for the defendants. On the other hand, the state called two witnesses who testified that if they had felt that the accused could not obtain an impartial trial they would have signed an affidavit for change of venue on request, but there were no such conditions in the township where they resided.

It is apparent from the record that no condition of violent animosity or excitement throughout Mississippi county prevented obtaining the requisite two affidavits for change of venue. Only a few qualified persons in Blytheville were called on and

940

their individual disinclination to make the oath falls far short of proving that the claimed condition of excitement or hostility prevented the required showing being made. No application was made for postponement to permit further search for signers and the fair conclusion from the record is that the attorney's estimate of the jury influenced him not to pursue further efforts to obtain a change of venue. He made his point as to change of venue by request before the trial, supported by his statement as to what he had done in the matter of obtaining the necessary affidavits, and preserved the adverse ruling for review by the Supreme Court of Arkansas. That court gave it consideration (as well as the many other contentions urged before it) and held. in its opinion that "the statement of counsel for appellants at the trial as to why he could not get another or other affidavits cannot supply the omission" to comply with the statute. We also are of the opinion that the facts shown concerning the failure to support an application for change of venue are insufficient to justify a holding that these appellants were prevented by any mob spirit from exercising their right to file the requisite affidavits for change of venue.

The court below properly denied the application for the writ and its order is affirmed.