**Benjamin George TUCKER, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 18532.**

United States Court of Appeals Eighth Circuit.

March 23, 1967.

Rehearing Denied April 19, 1967.

8. A perceptible characteristic of Bruton was a "bad" eye. This was observed by Miss Miller during the holdup.

Lloyd E. Humphreys, Cedar Rapids, Iowa, for appellant and filed typewritten brief.

Charles W. Ehrhardt, Asst. U. S. Atty., Sioux City, Iowa, for appellee. Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, was with him on the brief.

Before MATTHES, LAY and HEANEY, Circuit Judges.

MATTHES, Circuit Judge.

Pursuant to a waiver of prosecution by indictment, duly executed by Benjamin George Tucker and his attorney, Tucker was prosecuted under an information and convicted by a jury of violating 18 U.S.C. § 2312 (1948), commonly known as the "Dyer Act."[1] We hereinafter refer to Tucker as defendant, or by name.

The district court, Honorable Edward J. McManus, sentenced the defendant pursuant to the provisions of the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5024 (1950), as amended, 18 U.S.C. §§ 5005–5026 (Supp.1966). This appeal followed.

There is no controversy as to the actual commission of the offense. The Government established by undisputed evidence that a 1965 F–85 Oldsmobile, the property of John Flynn of Dubuque, Iowa, was unlawfully taken from the front of Flynn's home sometime between 9:30 P.M., July 9, 1966 and 1:30 A.M., July 10th. The automobile was transported from Dubuque, Iowa to Memphis, Tennessee, and was found abandoned two or three blocks from the rooming house in which Tucker and his accomplice, James Murphy, had stayed. Although defendant testified in his own behalf he made no attempt to deny commission of the offense.[2] Tucker also unsuccessfully attempted to establish an alibi to the effect that he was playing cards at the home of a friend at the time the automobile was stolen.

Defendant's principal ground for reversal is the claimed erroneous admission into evidence of certain incriminating statements made by him to law enforcement officials following his arrest and detention on July 14th in Tupelo, Mississippi on a vagrancy charge. Although defendant tacitly concedes on appeal that the warning given at the outset of the in-custody interrogation complied with the guidelines established in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (June 13, 1966),[3]

1. 18 U.S.C. § 2312, relating to the interstate transportation of stolen vehicles, provides as follows:
   "Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

2. Defendant's direct examination was limited to proving (a) he was one of eleven children; (b) his educational background terminated at the ninth grade and (c) police investigator Sam Allen had not advised him of his "constitutional rights." Objections by defendant's attorney, sustained by the court, prevented the Assistant United States Attorney from cross-examining defendant as to his involvement in the offense

3. Defendant was arrested by the Tupelo Police between 5:45 and 6:00 A.M. on the morning of July 14th. Shortly after 8:30 A.M. police investigator Sam Allen, a former F.B.I. Agent for over twenty-four years, conducted the initial interrogation of Tucker in the presence of Lieutenant Taylor Hopkins and Officer Felix McClelan of the Tupelo Police Department. At the trial Allen testified unequivocally that he gave Tucker the following warning prior to the interrogation:
   "I advised Mr. Tucker who I was. I think I told him that I was a retired F.B.I. agent and I was working for the police department, and told him that we

he nevertheless contends that he did not unequivocally articulate a waiver of his right against self-incrimination. Additionally, he asserts that it was essential that investigating officers advise him of his full complement of rights, as announced in *Miranda,* prior to each and every interrogation.

The Supreme Court in *Miranda* dealt with "the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action." The prosecution may not use inculpatory statements emanating from the custodial interrogation of the accused, "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S. Ct. at 1612.

The Supreme Court clearly delineated guidelines which were devised to inform an accused person of his right to remain silent and to assure the accused a continuous opportunity to exercise that right.

Prior to any interrogation the accused must be warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The defendant, however, may effectively waive his exercise of these rights, provided the waiver is made "voluntarily, knowingly and intelligently." Furthermore, if the accused indicates in any manner at any stage of the interrogation process that he desires to consult with counsel prior to making a statement or suggests in any manner that he does not wish to be interrogated, the police may no longer attempt to question him. 384 U.S. at 445, 86 S.Ct. 1602.

■ Of particular significance in addition to the safeguards themselves is the fact that they must be articulated by

the interrogating officer "prior to any questioning" or "at the outset of the interrogation process." 384 U.S. at 445, 86 S.Ct. at 1612. Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a companion case to *Miranda,* reveals that a confession obtained by one authority after proper warning may be invalid and inadmissible for failure of the first interrogating authority to timely and fully advise the person in custody of his constitutional right against self-incrimination. See also Evans v. United States, 375 F.2d 355 (8th Cir., March 22, 1967), where we dealt with the same question. The timeliness of the warning therefore may be as important as the warning itself.

The defendant in this case admitted his participation in the crime to two law enforcement officials on two separate occasions. The issue concerning the admissibility of his incriminating statements in the trial was raised initially by a motion to suppress. At the outset of the trial Judge McManus, in accordance with the rule promulgated in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908 (1963), conducted a plenary hearing out of the presence of the jury to determine the voluntariness of the incriminating statements and their admissibility into evidence in light of *Miranda.* Following the voir dire hearing, the court made a finding that the warnings given to the defendant by the investigating officers comported with the constitutional standards established by *Miranda,* that the defendant had waived his rights, and that his incriminating statements were therefore admissible.

■ On the record before us, we believe the trial judge fully and independently resolved the *Miranda* issue against the defendant, as he was required to do under Jackson v. Denno, supra. The pro-

---

wanted to talk to him, and informed him he did not have to make any statement to us, that anything he did say could be used against him in court, advised him of his right to talk to an attorney, told him that he had the right to have an attorney there; if he did not have mon-

ey to employ an attorney the court would appoint an attorney for him." Lieutenant Hopkins substantially corroborated Allen's warning. Allen himself further substantiated the extent of the warning on cross-examination.

cedures outlined in that case clearly require an independent determination of the *Miranda* issue by the court prior to any reconsideration of the issue by the jury. Evans v. United States, supra.

After resolving the issue of voluntariness and waiver, the court announced, pursuant to a request from defendant's counsel, that evidence relating to the circumstances under which the confessions were obtained would be submitted to the jury. The court was apparently motivated to pursue this course of action for the reason that the defendant had denied in the voir dire hearing that he had been fully advised of his constitutional rights. The announced procedure was followed. The same evidence before the court in the voir dire hearing was presented to the jury, except for the fact that the defendant confined his testimony before the jury to a denial that Sam Allen had ever appropriately advised him as to his rights. The question was then submitted to the jury by an instruction.

Defendant asserts error in submitting the issue of the sufficiency of the *Miranda* warnings and the defendant's purported waiver of his rights to the same jury that was to hear independent evidence as to the defendant's guilt. We have difficulty in reconciling this contention with the position adopted by defendant during the trial of the case. The court entertained some doubt as to whether the questions of constitutional warnings and waiver should be developed before and submitted to the jury. There can be little doubt, however, as to defendant's attitude in regard to these matters. His counsel not only failed to object to the submission of these questions, but clearly invited the procedure which he now condemns. In fact, counsel for defendant offered an instruction dealing with all aspects of the *Miranda* warnings and waiver. It was refused solely for the reason that the court felt, as we do, that its instruction fully covered this phase of the case. As thus posited, we do not regard defendant's present complaint as meritorious:

"Where parties, even in a criminal case, knowingly and deliberately adopt a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time, after a decision has been rendered adverse to them, to obtain a retrial according to procedure which they have fully discarded and waived." Carruthers v. Reed, 102 F.2d 933, 938 (8th Cir. 1939), cert. denied, 307 U.S. 643, 59 S.Ct. 1047, 83 L.Ed. 1523 (1939). Cf. Larson v. United States, 275 F.2d 673, 679 (5th Cir. 1960), cert. denied, 363 U.S. 849, 80 S.Ct. 1627, 4 L.Ed.2d 1732 (1960).

As we understand Jackson v. Denno, after the court has made its initial determination that the confession has been voluntarily made, and therefore constitutes admissible evidence, it need not submit that question to the jury for its determination and can exclude from their consideration evidence relating to that issue. We fail, however, to perceive how the defendant was prejudiced by the procedure that was followed—a course which he himself invited, apparently in the hope that the jury would be more responsive to his appeal. More important, however, is the fact that we do not read Jackson v. Denno as condemning this practice. On the contrary, the Supreme Court intimates that submission of the voluntariness issue to the jury rests within the discretion of the trial court:

"In jurisdictions following the orthodox rule, under which the judge himself solely and finally determines the voluntariness of the confession, or those following the Massachusetts procedure, under which the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused, the judge's conclusions are clearly evident from the record since he either admits the confession into evidence if it is vol-

untary or rejects it if involuntary." 378 U.S. at 378–379, 84 S.Ct. at 1781 [4]

We turn now to the evidence bearing upon the question of the admissibility of defendant's incriminating statements. Between 5:30 and 6:00 A.M. on July 14, 1966 two Tupelo police officers, pursuant to a complaint, found Tucker and Murphy sleeping at the rear of a private residence. They were arrested and placed in the Tupelo jail on a charge of vagrancy. Sam Allen, Jr., a retired F.B.I. Agent and part time investigator for the Tupelo Police Department, interviewed Murphy and Tucker separately between 8:00 and 8:30 A.M. that day. Prior to any questioning, however, Allen warned each of them of their rights in accordance with the teachings of *Miranda*.[5] Murphy and Tucker explicitly declined the services of counsel, stating they had not violated any law and were not wanted anywhere. In response to an inquiry sent to the Dubuque, Iowa Police Department, however, Allen received a telegram stating that Murphy was in fact a parole violator at the time of his arrest, and that a charge involving larceny of a motor vehicle was pending against Tucker in an Iowa state court.

On the morning of July 15th John Castles, an F.B.I. Agent for eighteen years, also interviewed Tucker. Castles had information that Tucker might be implicated in a Dyer Act offense. Tucker professed his innocence of any violation of the law and again declined the assistance or advice of counsel.[6] The Tupelo Police surrendered custody of Murphy to a Federal Parole Officer on the afternoon of July 15th.

Pursuant to a request from Tucker, Agent Castles interviewed him on the afternoon of July 15th in the presence of F.B.I. Agent Thomas Dolan. On this occasion Castles again advised Tucker of his rights and was informed by Tucker that he did not want an attorney. Tucker then proceeded to confess that he and Murphy had stolen the Oldsmobile automobile in Dubuque in the early morning of July 10th, had driven it to Memphis, Tennessee, and then had abandoned it near the hotel where they had stayed for two days.[7] Tucker declined the offer to reduce his oral admissions to a signed statement, but voluntarily signed a waiver of extradition, allowing him to be turned over to Iowa authorities.

On the night of July 18th Captain Byrne O'Brien of the Dubuque, Iowa Police Department and Jack Moore of the Iowa State Patrol arrived via airplane in Tupelo to effect the return of Tucker to Iowa on the pending larceny charge. O'Brien, accompanied by Moore, interviewed Tucker. After Captain O'Brien

---

4. In footnote 8 of the opinion in *Jackson* the Court seems to explicitly sanction use of the Massachusetts procedure in resolving the admissibility issue.

5. Allen had attended a "police school" on the day before (July 13th) and had been thoroughly briefed as to the warning requirements announced in *Miranda*.

6. Castles also advised Tucker, prior to any interrogation, of his right to remain silent, that any statement he might make could be used against him in a court of law, that he had the right to consult an attorney or anyone of his own choosing prior to making a statement, that no threats or promises would be made to induce him to make a statement, and that if he were charged by federal authorities and could not afford an attorney one would be appointed for him.

7. On this occasion the following occurred:
"When he [Tucker] entered the room I [Castles] again exhibited my credentials and introduced Mr. Dolan who had no previous contact with him, and again advised him, I said, 'you know you don't have to talk with me. Anything you do say can be used against you in a court of law. You have a right to consult an attorney or anyone of your choice prior to making any statement; that no threats or promises will be made to you to cause you to make any statement, and should you be charged by Federal authorities and cannot afford any attorney one would be appointed for you,' and his reply was that 'I don't want one'."

had identified himself, he fully apprised Tucker of his right to remain silent.[8]

During the interview Tucker advised O'Brien where the stolen automobile had been abandoned. The next morning Tucker was returned by airplane to Dubuque and placed in the Dubuque County Jail. On July 21st, Tucker appeared before the United States Commissioner pursuant to a warrant of arrest issued the same day.

We have carefully examined the whole record and have no difficulty in concluding that there is no substance to defendant's claim of error respecting the admission into evidence of the incriminating statements made to F.B.I. Agent Castles on July 15th and to Officer O'Brien on July 18th. This record demonstrates with certainty (a) that on the morning he was arrested Tucker was fully warned of his rights at the very outset of the interrogation process, in language which he manifestly understood; (b) that he voluntarily, knowingly and intelligently waived counsel. As the foregoing résumé of the facts indicates, Tucker professed his innocence of any wrongdoing during the first two interviews. We find it significant, however, that despite his denial of any implication in the car theft, Tucker in no way indicated to the interrogating officials any disinclination to submit to further questioning. On the afternoon of July 15th, after Murphy had been surrendered to a Federal Parole Officer, Tucker, of his own accord, requested Castles to come to the jail. Apparently, Tucker had decided to purge his conscience and to reveal his involvement in the theft and interstate transportation of the automobile. There is not the slightest indication that Officer Allen, F.B.I. Agent Castles or any other person exerted any pressure, physical or psychological, to elicit the incriminating admissions from Tucker. On the contrary, it is convincingly clear that these officers in good faith attempted to and did surround Tucker with the safeguards to which he was entitled.

Although it cannot be gainsaid that the guidelines laid down in *Miranda* must be given meaningful application, the Supreme Court did not prescribe an exact format or postulate the precise language that must be used in advising a suspect of his constitutional right to remain silent. Courts must, of course, zealously guard against an invasion of that right. In resolving the question in light of the *Miranda* standards, the substance and not the form of the warnings should be of primary importance.

On the record before us, we hold that the warnings given constituted sufficient compliance with the admonitions set forth in *Miranda,* and that the defendant, fully apprised of a meaningful choice in regard to his right against self-incrimination, voluntarily, knowingly and intelligently waived his privilege to remain silent on July 15th. In short, the record convincingly sustains Judge McManus' findings that defendant was timely advised of his *Miranda* rights and intelligently waived the same of his own volition. Any other conclusion, we feel, would have been contrary to the overwhelming weight of the evidence.

---

8. Captain O'Brien, in our view, provided defendant with a comprehensive warning during his interrogation:

"Q. What warnings did you give to the defendant?

A. That he did not have to talk to us at all about the matters that I had brought up to his attention; that if he did talk at all, it would have to be free and voluntary, and that he could stop talking at any time if he so desired, and that legal counsel would be made available to him at any time if he wanted, as of that interview, and if at any time he decided that he wanted an attorney he could so indicate to me. I further pointed out to him that I preferred that no conversation pertaining to these matters take place while we were enroute to Dubuque, Iowa.

\*   \*   \*   \*   \*

Q. Did you say anything to him about it [the right of self-incrimination] in your warning to him?

A. I believe in my warnings to him I certainly indicated that anything he would say would be used against him in any subsequent court action."

Defendant also contends that his inculpatory statements were inadmissible for the reason that they were volunteered during a period of illegal detention by local and federal authorities and that there was an unnecessary delay in bringing him before a magistrate contrary to the provisions of Rule 5(a), Fed.R.Crim.P., and the procedure required in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

It appears beyond a doubt that Tucker was initially arrested by local authorities and charged with vagrancy. During the first interview with Investigator Allen, at the outset of which the *Miranda* warnings were given, Tucker admitted that he had been released under bond in Dubuque, Iowa for car theft. The record also reveals that on the afternoon of July 14th Captain O'Brien of the Dubuque Police Department informed the Tupelo Police that defendant's appearance bond in the Iowa criminal case had been increased from $500.00 to $2,000.00. O'Brien advised that he would send a telegram confirming the pending Iowa charge, and also requested that Tucker be held for the Iowa authorities. After these events Tucker voluntarily waived extradition back to Iowa.

The events that transpired conclusively establish that Tucker was not arrested or detained in Tupelo under federal law, but that he was in the sole custody of local officials at the time F.B.I. Agent Castles conducted his interrogation. Defendant concedes as much, but argues that there was a "working arrangement between the various state authorities and the Federal Government" to illegally detain him for purposes of federal interrogation. Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1942), relied upon by Tucker, condemns such an arrangement. The weakness of Tucker's position, however, results from a total failure of proof of an unlawful collaboration between the local and federal authorities for the purpose of procuring an illegal confession. Mere suspicion of a "working arrangement" is insufficient. Thibodeau v.

United States, 361 F.2d 443, 444 (5th Cir. 1966); United States v. Coppola, 281 F.2d 340, 344–345 (2nd Cir. 1960), aff'd 365 U.S. 762, 81 S.Ct. 884, 6 L.Ed.2d 79 (1961). Cf. United States v. Ardner, 364 F.2d 719, 720 (4th Cir. 1966), cert. denied, 385 U.S. 884, 87 S.Ct. 177, 17 L.Ed. 2d 112 (1966).

Young v. United States, 344 F.2d 1006 (8th Cir. 1965), cert. denied, 382 U.S. 867, 86 S.Ct. 138, 15 L.Ed.2d 105 (1965) presented the same question on facts somewhat similar to our case. Judge Mehaffy, for the court, meticulously reviewed a number of cases involving the "working arrangement" doctrine. What was said in *Young* is pertinent to our situation:

"＊ ＊ ＊ A bare suspicion of a 'working arrangement' will not justify reversing the decision of the District Court which had the benefit and advantage of hearing the live testimony and observing the demeanor of the witnesses."

It is also settled law that Rule 5(a), Fed.R.Crim.P., which requires that a person who is arrested be brought before a United States Commissioner without unnecessary delay, may be invoked only when an officer makes an arrest under federal law. Absent an arrest by federal authorities, there must be evidence indicating that the arrest and detention were at the request of federal authorities or for the purpose of assisting them. The rule has no application where, as here, it is clear that at the time the statement was made the person has been arrested by local authorities and is in their sole custody. Young v. United States, supra. See also Butterwood v. United States, 365 F.2d 380, 384 (10th Cir. 1966); Lovelace v. United States, 357 F.2d 306, 310 (5th Cir. 1966); Swift v. United States, 314 F.2d 860, 862 (10th Cir. 1963); United States v. Sailer, 309 F.2d 541, 542 (6th Cir. 1962), cert. denied, 374 U.S. 835, 83 S.Ct. 1884, 10 L. Ed.2d 1057 (1963).

Defendant objects to the admission into evidence of certain Government exhibits and statements by a Government

witness which tended to implicate him in the commission of another offense not connected with the present prosecution. Of particular concern to the defendant is the telegram received by Police Investigator Sam Allen, which indicated that defendant was presently free on bond, pending trial on a state charge involving theft of a motor vehicle. Allen, over the defendant's objection, testified before the jury as to the contents of this telegram.

■ There is little dispute as to the general rule that placing before the jury evidence of other offenses committed by the defendant constitutes prejudicial error. Osborne v. United States, 351 F.2d 111 (8th Cir. 1965).[9]

The Government's position is that because the defense initially injected into the trial the issue of whether the confessions were elicited during a period of illegal detention, it had the right to account for the delay in transferring him to federal custody.

■ Whether Tucker's right to be taken before a Commissioner without unnecessary delay had been violated presented a question of law for the court and not an issue of fact for the jury. However, in view of all of the circumstances properly before the jury, we do not believe that the error, if any, in the introduction of the telegram and other exhibits relating to the state charge pending against Tucker, was of such a nature as to affect his substantial rights.[10]

It cannot be denied that there was other evidence of the state charge. In the waiver of extradition, voluntarily executed, Tucker acknowledged the pendency of the Iowa proceeding.[11]

We do not deem it useful to further expand this opinion in regard to this assignment of error. In the final analysis and of key importance here is the fact that defendant admitted his participation in the offense. We have demonstrated that his confessions were voluntary within the meaning of the law and were properly admitted into evidence. In this situation we cannot bring ourselves to believe that the evidence under attack could have had any substantial impact upon or improperly influenced the jury.

■ Complaint is also made of some of the court's instructions. We have examined and considered the court's charge as a whole in light of the contentions raised and are convinced that the jury was fully and properly instructed as to the applicable law.

Lastly, defendant contends that the district court erred in admitting into evidence certain hearsay testimony elicited from one of his witnesses, James Walker, on cross-examination. Defendant argues that the effect of this testimony was to connect the defendant with the commission of a crime and prejudice him in the eyes of the jury. We have fully examined the defendant's complaint and find that the court's ruling in no way prejudiced him.

We are convinced the defendant received a fair trial. The court carefully safeguarded his constitutional rights and the verdict is responsive to substantial evidence.

Accordingly, we affirm.

---

9. An exception to this rule is that evidence of other crimes is admissible if it tends to prove some material fact or aspect of the prosecution's case, even though it may incidentally prove the commission of an independent offense. See, e. g., Hess v. United States, 254 F.2d 585, 588 (8th Cir. 1958); Smith v. United States, 236 F.2d 260, 267–268 (8th Cir. 1956), cert. denied, 352 U.S. 909, 77 S.Ct. 148, 1 L.Ed. 2d 118 (1956); Bram v. United States, 226 F.2d 858, 863 (8th Cir. 1955); Hardy v. United States, 199 F.2d 704, 707 (8th Cir. 1952).

10. Fed.R.Crim.P. 52 provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

11. The only objection to introduction of this document was on the basis of improper foundation.