OZARK REAL ESTATE COMPANY,
Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18484.

United States Court of Appeals
Eighth Circuit.

May 16, 1967.

Sam Sexton, Jr., Sexton & Robinson, Fort Smith, Ark., for appellant, H. Clay Robinson, Sexton & Robinson, Fort Smith, Ark., on the brief.

Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., for appellee, Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, Atty., Dept of Justice, Washington, D. C., Charles M. Conway, U. S. Atty., and Max E. Findley, Sp. Asst. to the U. S. Atty., Fort Smith, Ark., on the brief.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This appeal is from a judgment of the United States District Court for the Western District of Arkansas approving the report of a condemnation commission appointed under Fed.R.Civ.P. 71A (h). The report fixed compensation for the Government's taking of certain lands and flowage easements for the Dardanelle Lock and Dam Project on the Arkansas River. The Government condemned fee title exclusive of mineral rights to certain designated portions and flowage easements to other portions of the area. The total area condemned approximated 1613 acres. Coal deposits and possibly natural gas underlie the lands involved. The mining activity and the character of the coal in this area are described in the opinion of this court in the recent case of Mills v. United States, 363 F.2d 78, 79 (8th Cir. 1966).[1]

This case is unique in that at trial the parties agreed that the valuation of the taking should be considered by treating separately four distinct elements: (1) surface estate; (2) oil and gas estate; (3) strippable coal estate; and (4) deep coal estate. After pretrial conferences and the commissioners' viewing of the property, a hearing was held wherein seventeen witnesses testified and thirty-three exhibits were introduced. The commission found as just compensation for the total taking the sum of $240,600.00. It allocated the awards as follows: $25,000.00 for the strippable coal; $15,600.00 for the oil and gas interests; $150,000.00 for the surface estate; and $50,000.00 for the deep coal estate and severance damage. This appeal is only from that part of the total award involving the deep coal estate.

■ Ozark asserts as error the commission's failure to report the method by which the award was determined, thereby violating the teachings of United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964), or, in the alternative, if compliance with *Merz* is found, the commission used an incorrect measure of just compensation in arriving at the award.

We find no merit in either argument. Recently we had occasion to carefully

1. Ozark was also a party appellant in the *Mills* case, represented by the same attorneys, as was the Government.

consider and analyze the *Merz* decision in United States v. Bell, 363 F.2d 94 (8th Cir. 1966); Mills v. United States, supra; and Morgan v. United States, 356 F.2d 17 (8th Cir. 1966). In *Morgan*, supra, Judge Blackmun writing for this court stated:

> "We, however, read *Merz* as requiring not meticulous compliance with every particular therein mentioned, but as suggesting standards which assure fairness to both condemnor and condemnee and provide safeguards against a commission's natural tendency, when not controlled, to use its own assumed expertise." 356 F.2d at 23.

Mr. Justice Douglas in *Merz*, supra, after stating that the commission should be instructed in certain details and that "[c]onclusory findings are alone not sufficient" as they do not reflect the path taken by the commissioners through the maze of conflicting evidence, set forth as additional guidelines:

> "The commissioners need not make detailed findings such as judges do who try a case without a jury. Commissioners, we assume, will normally be laymen, inexperienced in the law. But laymen can be instructed to reveal the reasoning they use in deciding on a particular award, what standard they try to follow, which line of testimony they adopt, what measure of severance damages they use, and so on. We do not say that every contested issue raised on the record before the commission must be resolved by a separate finding of fact. We do not say that there must be an array of findings of subsidiary facts to demonstrate

that the ultimate finding of value is soundly and legally based. The path followed by the commissioners in reaching the amount of the award can, however, be distinctly marked. Such a requirement is within the competence of laymen; and laymen, like judges, will give more careful consideration to the problem if they are required to state not only the end result of their inquiry, but the process by which they reached it." 376 U.S. at 198–199, 84 S.Ct. at 643.

Judge John E. Miller, an able judge with much expertise in the field of eminent domain, meticulously instructed the commissioners in the instant case. Ozark makes no complaint concerning the court's charge. Its complaint is directed solely at the text of the report of the commission. This report, however, was much more than a conclusory finding. It clearly and distinctly revealed the path taken by the commissioners in reaching the amount of the award. The report, after describing the tracts involved and the issues as agreed to by the parties, the parties' connotation of "deep coal," the present mining activity on the property, the annual volume of production, the present market, and the lack of market for this type coal for fuel, then proceeded to set forth the substance of and analyze the expert witnesses' evidence of both parties. It made clear its rejection of the testimony of Ozark's expert witness, Mr. Robinson, who envisaged a hypothetical plant that could only operate profitably by capturing the entire market, thereby forcing competition out of business and at the same time greatly enlarging the future market for this type coal.[2]

2. The following comment regarding the obviously speculative and conjectural character of this evidence is from the report:

> "There is, of course, an element of speculation in the sense of hazard in forecasting any business prospect. It is difficult to ascertain the line to be drawn on any testimony as to whether it is speculation as a matter of law or whether it is a question of fact to be considered by the triers of fact. Mr.

Robinson seems to be qualified to make a projection as to the future trends of the coal market. A part of his projection to justify building a plant such as he envisions rests upon an assumption that such plant would, in effect, drive the present operators into bankruptcy by securing all of their customers, and thereby obtain the coal upon which these operators now have the exclusive right to mine. It appears to the Commission that there are too many contingen-

The Government's expert witness, Mr. Weir, testified that the valuation of the deep coal property was $20.00 per acre —thus by simple multiplication, one could arrive at the value of the taking of approximately $32,000.00. The report, however, reflected the commissioners' finding that Mr. Weir failed to take into account the severance damage, the admitted possibility of some expansion of the market for this type coal and the loss of access to other coal.[3]

This evidence makes it abundantly clear what path the commissioners took in determining its valuation. The commissioners properly disregarded the speculative aspects of Ozark's expert witness and also noted that the Government's expert witness failed to take into consideration the severance damage. The District Court characterized the conflict in the evidence as primarily one of weight and credibility of the witnesses, rather than the substantiality of the testimony, and was convinced that the findings were not only fair but supported by substantial evidence. In a concluding paragraph of a nine page unpublished opinion, the District Court stated:

"In the opinion of the court the awards made by the Commission are supported by substantial evidence, and the Commission did a remarkable job considering the manner in which the case was tried by both parties. No injustice has been done, unless it

---

cies involved in this projection. If the present users of Spadra coal increase their demand by 50%; if salesmanship is successful in adding another 50,000 tons per year to the demands; if the purchaser of these coal lands can succeed in capturing all of that market; and if a plant could be built within the estimates of Mr. Robinson; and if a large steel company or smelter would have no reticence about driving the present operators out of business; and· if the estimated tonnage of coal exists and can be recovered, then a purchaser could obtain the estimated 19% return on the investment. For any increased return Mr. Robinson would have to be right about his forecast as to the demand seven years hence. There are too many contingencies for the Commission to find Mr. Robinson's projected market and use for Spadra coal in the reasonably foreseeable future."

3. "We are not satisfied to take Mr. Weir's apparently arbitrary figure of $20.00 per acre and multiply by any given number of acres in arriving at a conclusion with respect to the deep coal involved in this case.

"The Commission finds that the taking in this case eliminates approximately seven million tons of coal from the reserves of the Ozark Real Estate Company. The total quantity of reserves has a bearing upon market value of the coal. In other words, in a situation such as we have here, where there are producing mines, coal reserves in quantity have a value that would not exist on small isolated tracts.

"We find that the taking has, in effect, destroyed any prospect of a large single operation and that the future coal will have to be mined by such operations as now exist, which Mr. Robinson characterized as 'dog holes.' Apparently, both engineers are of the opinion that there will be some increase in the market for coal for zinc smeltering, and therefore there is a reasonable possibility of expansion of this market.

"There is disagreement as to the extent of such an expansion, but as Mr. Justice Jayne said in re Port Authority of New York, 28 N.J.Super. 550 [575, 101 A.2d 365]. 'Experience has disclosed that both optimism and pessimism may be found to exist in the minds of expert witnesses.'

"It may be that at the present rate of production or at the projected rate of even two hundred thousand tons per year that the coal rendered valueless by this taking would not be reached for many years. Nevertheless, such reserves would have some value.

"Under the instructions to the Commission by the Court we should ascertain fair market value of the whole, including its value for coal, strippable coal, oil, gas and agricultural uses, of the parties to determine these issues separately. Considering the present and probable future markets and taking into account both the optimism and pessimism of the witnesses the Commission finds that the damage to the deep coal in these two tracts amounts to the sum of $50,000.00 by virtue of the taking, including severance damages and loss of access to other coal not involved in this case."

would be in the award of $150,000 for surface estates, but there is testimony to support that figure although in the opinion of the court it appears to be rather liberal. The record discloses direct conflicts in the testimony of the mining engineers who testified, particularly with reference to future market, possibility of sale of additional coal to zinc operators, possible sale of coal for iron or steel mills, the use of coal for sintering purposes, and in all other respects. The conflicts are primarily a matter of weight and credibility rather than the substantiality of the testimony, and, as heretofore stated, the court is convinced that the report of the Commission is fair and supported by substantial evidence. The case was tried in the manner in which the parties themselves agreed to try it. They elected to try only the tracts involved, and the fact that testimony relevant to the amount of coal in other lands was heard was not prejudicial to the landowner. If it was error, it was induced by the parties themselves, and particularly the landowner. No doubt the landowner thought by injecting the other lands not involved herein in the case that he could thereby increase the damages to the deep coal that is involved in the instant proceeding."

■ The main thrust of Ozark's argument is that the commission report was not based on a "before and after" valuation. We are not persuaded by this argument. We recognize such an approach as a valid, useful standard, but its adaptability here was aborted by the parties' agreement that valuation should be determined by giving separate treatment to the four distinct elements. The standard of compensation in federal condemnation cases was described in United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed. 336 (1943) as the "full and perfect equivalent in money of the property taken."

However, experts for both parties testified as to the "before and after" value, and it is clear that the commission basically accepted the figure of the Government's expert but added thereto the severance damage and, as noted, the trial court found substantial evidence to support this award.

■ However, Ozark is in no position to complain because it agreed to the deviation from the court's instructions as a matter of procedure in trying this case on the issue of valuation of separate elements. It is nonsensical to suggest that it can accept the fruits of the commissioners' report based on the same method as to three of its findings and justifiably cry foul as to the fourth. It would be a queer rule that would permit one to induce or agree to the ground rules and then perch an error and obtain a retrial on one facet of the award which does not suit him. Judge Matthes of this court recently restated this principle in Tucker v. United States, 375 F.2d 363 (8th Cir. March 23, 1967) by quoting an apt excerpt wherein the rule was enunciated by this court in the earlier case of Carruthers v. Reed, 102 F.2d 933, 938 (8th Cir. 1939), cert. denied, 307 U. S. 643, 59 S.Ct. 1047, 83 L.Ed. 1523 (1939):

"Where parties, even in a criminal case, knowingly and deliberately adopt a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time, after a decision has been rendered adverse to them, to obtain a retrial according to procedure which they have voluntarily discarded and waived."

The trial court was of the opinion that the total award was a little on the liberal side, but did not reduce it as there was substantial evidence to sustain it.

We find no prejudicial error and the judgment is affirmed.