STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. THOMAS LEROY YOUGH, JR., DEFENDANT-RESPONDENT.

Argued April 24, 1967—Decided July 5, 1967.

588

*Mr. Harry Smith,* Assistant County Prosecutor, argued the cause for appellant (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

*Mr. Leonard I. Garth* argued the cause for respondent (*Mr. Stephen A. Ploscowe,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The defendant was indicted for murder and is awaiting trial. He served notice that he would move for an order before trial excluding his alleged confession on the ground that it "was tendered under circumstances which would not comply with the decision of the United States Supreme Court in *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966)." The notice also set forth that the motion would be limited to the issue of whether *Miranda* had been satisfied and would not "preclude the defendant from raising this and any other exclusionary grounds" at the trial. The trial judge undertook to hear the motion despite its fragmented form, took the testimony of the police and the defendant, and ultimately entered an order excluding the confession as inadmissible under *Miranda.* Pursuant to the State's application, leave to appeal to this Court was granted. *R. R.* 1:2–4(c).

Under our long-standing practice, the determination as to the admissibility of a confession is properly made at rather than prior to trial. See *State v. Cicenia,* 6 *N. J.* 296, 301–02 (1951), *certiorari* denied 350 *U. S.* 925, 76 *S. Ct.* 215, 100 *L. Ed.* 809 (1955); *State v. Green,* 49 *N. J.* 244 (1967); cf. *State v. Ferrara,* 95 *N. J. Super.* 329 (*App. Div.* 1967). Proposed alterations of the practice were the subject of discussion at the last Judicial Conference and are receiving study. See 90 *N. J. L. J.* 257 (1967). In the meantime and pending the promulgation of formal rules, pre-trial exclusory motions addressed to confessions, particularly where fragmented as here, are not to be entertained. However, in the instant matter, the motion was heard with

the State's consent and we therefore pass the procedural irregularity.

On September 10, 1966 the decedent James Disney was mugged in Paterson and suffered wounds from which he died. On September 13th two detectives of the Paterson police force visited the home of the defendant Thomas LeRoy Yough, Jr., told his mother that they wanted to speak to her son about an investigation of an auto accident, and told him that they would like him to accompany them to headquarters. He did so and arrived there shortly after noon. He had lunch and waited in a room by himself until Detective Mohl arrived at 1 P. M. At that time the defendant was told that he was there in connection with the investigation of a mugging which had resulted in the victim's death. The detective testified that he advised the defendant that he had the "right to remain silent," that he had the "right to a lawyer" and that a lawyer would be supplied to him "at his request." He also testified that he told the defendant that anything he said "may be taken down and used in court against him" and that "he had a right to a lawyer even if he couldn't afford one." In response to a question from the trial judge as to what the defendant had said after he was first warned and told about a lawyer, the detective testified that the defendant said he "didn't want a lawyer."

Detective Mohl testified that after he had warned the defendant and had specifically asked him whether he understood his rights, the defendant affirmatively said that he did. The detective stated that he repeated the warnings, and he noted that it was his consistent practice since *Miranda* to warn suspects repeatedly as to their constitutional rights. He stated further that the defendant, after he had been warned of his rights, said that he wanted to tell him about the mugging incident and that he proceeded to do so orally. After the defendant had completed his oral remarks, the detective told him that a typewritten statement was going to be taken and again advised him that he had the right to remain silent, that any statement could be used against him in court, that he had

the right to a lawyer, and that even if he could not afford a lawyer he could have one "just at his request." After the defendant said he would give a written statement, he was taken to another room where Detective DeSilva had a typewriter.

According to the State's evidence, the defendant filled in and signed a waiver document before the written statement was taken. The date, the time, his name, and the signature affixed to the document which read as follows, were written by the defendant in ink and in a firm, clear hand:

"Paterson Police
Detective Bureau

Date 9-13-66                                                     Time 3 P M

I Thomas Yough knowing where I am, why I am here, have been told that I need not say anything as it may be used against me in a court of law. I have been told that I may call my attorney, or if I cannot afford one, an attorney would be supplied me.

No threats, promises or duress have been used. Knowing and understanding what this means, I waive my right to remain silent and wish to give a statement.

SIGNED      Thomas Yough

Sworn & Subscribed before
me this 13 day of Sept. 1966
Martin S. Brennan /s/
Notary Public of New Jersey
My commission expires June 10, 1968"

The defendant's written statement was taken in question and answer form with the questions being asked by Detective Mohl and being typed by Detective DeSilva. It bore the time 3:05 P. M. and the date September 13, 1966. It started out as follows: "I am Det. Sgt. Robert Mohl of the Paterson Police Dept. I am going to ask you some questions in reference to the crime for which you have been arrested. You may answer them or not; just as you wish; but what you say must be of your own free will, voluntarily, as this statement will be taken in writing and may be used at your trial." After the defendant answered preliminary questions as to his name and address, and answered affirmatively as to his ability to read and write English, he was asked, "Do you know why you are here?" The response was: "Yes, for mugging and a death

crime." The defendant was asked whether he knew that he had the right to remain silent and that he did not have to say anything regarding the crime and he said, "Yes, I do." He was then asked whether he wished to remain silent and have a lawyer present before going on with his statement and he said, "I don't want no lawyer."

During the course of the questioning, the defendant was told that his mother and father were there and he was asked whether he wanted to talk with them. He said, "Yes, but only for two or three minutes." At that point, which was 4 P. M., the taking of the statement was stopped while the defendant spoke with his mother and father in a separate room. At 4:30 P. M. the taking of the statement resumed. Toward its close, the defendant was asked whether he wished to add anything and he said "no" and in response to an inquiry whether he had told the truth he said "yes." He also answered "yes" to the final question which read: "I will now ask you to read this statement, correct any and all errors that you may find and initial same. After doing this I will ask you to sign it to show that it was given by you voluntarily without any force, fear, threats, or promise of reward. Will you sign it?" The statement was initialed on each page by the defendant, was signed by him, was witnessed by Detectives DeSilva and Mohl and was notarized by Donald F. Young, a Notary Public of New Jersey. The testimony of the police officers indicates that the signing took place at about 5 P. M.

Detective DeSilva testified that, in his presence, Detective Mohl warned the defendant as to his rights and that the defendant said he did not want a lawyer and would give a statement. He also testified that the defendant read the waiver document before he signed it and read the written statement before he initialed and signed it. He described the half hour interruption in the taking of the statement during which the defendant spoke to his parents in a separate room. The record indicates that the parents were in the court room during the hearing before the trial judge, but they offered no testimony in opposition to the State's evidence. However, the de-

fendant himself did testify, offering denials which appear to us to be incredible. He was eighteen years old and a junior in Kennedy High School at Paterson. He denied that he ever read the waiver document or the written statement or that he knew their contents though he acknowledged the initialing and his signatures. He denied that he was told at any time before the written statement was completed and signed that he had the right to remain silent, or that what he said could be used against him, or that he was entitled to a lawyer, or that he could have a lawyer even though he could not afford to pay for one. He said that he was positive that the question as to whether he wished to remain silent and have a lawyer present before going on was never asked. That, along with his other denials, was an assertion that the typewritten statement was an utter concoction and that Detective DeSilva had deliberately falsified when he stated that he typed the questions and answers just as they were given and in the very language used by Detective Mohl and the defendant. The trial judge did not find any such falsification and neither do we.

While doubting the number of warnings, the trial judge made an explicit finding that the defendant had in fact been warned. As he put it: "Now, there is no doubt that Detective Mohl is a very intelligent police officer and is fully cognizant of the *Miranda* opinion and requirements and has probably been instructed in police methods in an effort to comply with it. I find that he did warn the defendant in the terms that he stated them." Despite this finding, the trial judge concluded that *Miranda* had not been satisfied and that the confession should therefore be excluded. In reaching his conclusion he seems to have been troubled by suggested deficiencies in the form of the detective's warnings and in the nature of the defendant's waiver. He noted that the detective did not state in specific language that the defendant had the right to a lawyer before any questioning and before he decided whether he wanted to remain silent or give a statement. But the warnings were clearly intended to convey that thought and we have no reason to doubt that they did actually convey

it. The defendant does not contend that he misunderstood or was misled; indeed his position is that the warnings were not given at all but on that issue we, as did the trial judge, find the contrary. While the warnings, along with the waiver and the introductory material in the written statement, should as a matter of precaution hereafter be carefully clarified and enlarged to avoid any questions such as those raised here, we find the warnings in the circumstances before us sufficient within the terms and purposes of *Miranda. Cf.* Elsen and Rosett, "Protections for the Suspect Under *Miranda v. State of Arizona,*" 67 *Colum. L. Rev.* 645, 652–657 (1967).

The more crucial basis for the trial judge's exclusion of the confession was his finding that the State had not established beyond reasonable doubt that the defendant had "knowingly and intelligently" waived his privilege against self-incrimination and his right to counsel. *Miranda v. State of Arizona, supra,* 384 *U. S.,* at *p.* 475, 86 *S. Ct.,* at *p.* 1602, 16 *L. Ed. 2d,* at *p.* 724. This finding was largely grounded on the rejection of the State's evidence that the defendant had said before his oral interrogation that he did not want a lawyer. But our study of the record firmly convinces us that the State's evidence was credible, not only as to the warnings given to the defendant, but also as to the defendant's responses. While there was no writing which bore directly on the defendant's oral assertions shortly after 1 P. M., the later writings serve to strengthen the conclusion that, from the inception and throughout, the defendant's affirmative position was that he did not want a lawyer but wanted to make a statement though he knew his constitutional rights including the right to remain silent. It must be borne in mind, as the trial judge recognized, that the warnings were given in a conscientious effort to fulfill the requirements of *Miranda,* that the defendant responded in the affirmative when he was asked whether he understood his rights as outlined to him, that the defendant then said, according to the State's evidence, that he did not want a lawyer but wanted to make a statement, and that the defendant later filled in and signed the waiver document

and gave the answers appearing in his signed statement, including the affirmative response to the inquiry as to whether he understood that he had "the right to remain silent," and the assertion that he did not want a lawyer in response to the inquiry as to whether he wished "to remain silent and have a lawyer present" before going on with his statement.

There is no question as to the power of this Court to make new fact-findings on the basis of the record before it. *State v. Johnson,* 42 *N. J.* 146, 158 (1964). While the power is not generally invoked to displace ordinary fact-findings by the trial judge who saw and heard the witnesses, it will be invoked in those situations where the sound administration of justice calls for appellate "intervention and correction." *State v. Johnson, supra,* 42 *N. J.,* at *p.* 162. We consider this to be such a situation, particularly since here the findings were not exclusively factual but were intertwined with legal implications drawn by the trial judge from the opinion in *Miranda. Cf. State v. Daniels,* 38 *N. J.* 242, 250 (1962), *certiorari* denied 374 *U. S.* 837, 83 *S. Ct.* 1885, 10 *L. Ed. 2d* 1057 (1963). Thus he stressed that the defendant's "mere silence" would not constitute a waiver; he expressed the view that the waiver document did not "technically comply" with the Supreme Court's requirements; and he indicated that the language contained in the waiver document and in the written statement would not serve to satisfy him that there had been a waiver by the defendant of his "constitutional rights."

We agree that, under *Miranda,* waiver will not be presumed "from the silence of the accused after warnings are given." 384 *U. S.,* at *p.* 475, 86 *S. Ct.,* at *p.* 1628, 16 *L. Ed. 2d,* at *p.* 724. But waiver need not take a designated legal form or be expressed in designated legal terminology; indeed, as *Miranda* explicitly acknowledges, "an express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." 384 *U. S.,* at *p.* 475, 86 *S. Ct.,* at *p.* 1628, 16 *L. Ed. 2d,* at *p.* 724. That was the very situation here as it appears from the whole record. We reject the sug-

gestion that the defendant did not willingly waive his rights or that he did not comprehend what he was doing when he did so. The warning language used by the police authorities was simple and clear and there is no significant support for any contention that it was not understood by the defendant. As was pointed out earlier, there is no assertion on his part that he misunderstood the warnings; indeed his position is that none of the required warnings was given, but that was rejected by the trial judge below and is now rejected by us.

Before the opinion in *Miranda* was handed down, there was belief in some circles that the Supreme Court would outlaw all confessions by unrepresented suspects in custody. See *State v. Coleman,* 46 *N. J.* 16, 34 (1965), *certiorari* denied 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed.* 2d 212 (1966). *Miranda* did not do that but permitted the continued use of such confessions where the accused, after having been suitably warned, affirmatively waived his constitutional rights and made a voluntary confession. While the Supreme Court pointed out that the prosecution would have the "heavy burden" (384 *U. S.,* at *p.* 475, 86 *S. Ct.,* at *p.* 1602, 16 *L. Ed.* 2d, at *p.* 724) of establishing the waiver, it did not contemplate an impossible burden. Indeed, nowhere in its opinion did it describe the burden in terms of proof beyond a reasonable doubt although the trial judge here, with the State's consent, used that standard in excluding Yough's confession.

In *Clifton v. United States,* 371 *F.* 2d 354 (*D. C. Cir.* 1966) a divided court held that, although a trial judge may not admit a confession into evidence unless he is satisfied and so finds from the proofs that the confession was voluntary and was obtained in constitutional manner, he need not make any finding that the proofs met the standard of "beyond a reasonable doubt." In reaching its holding, the court relied heavily on the traditional evidential principle under which the trial judge passes on the admissibility of evidence, and where the admissibility rests on a qualification or condition, makes preliminary inquiry and finding as to its presence. See Rule 8 printed in *N. J. S. A.* following 2A:84A–16

(*Supp.* 1966); *Report of the Committee on the Revision of the Law of Evidence, p.* 17 (1955); *Report of the New Jersey Supreme Court Committee on Evidence, p.* 21 (1963). Wigmore states that when dealing with such preliminary inquiry and finding the rule of reasonable doubt has "no possible application". IX *Wigmore, Evidence* § 2550, *n.* 6 (3*d ed.* 1940); V *Wigmore* § 1451, *n.* 1. Although Wigmore's view is the one customarily applied when dealing with ordinary evidential matters, cases dealing with devastating evidence such as proof of other crimes, dying declarations and confessions, have presented conflicting views. See Maguire & Epstein, "Preliminary Questions of Fact in Determining the Admissibility of Evidence," 40 *Harv. L. Rev.* 392, 403 (1927); O'Regan, "Admissibility of Confessions—the Standard of Proof," [1964] *The Criminal Law Review* 287; *Scott v. State,* 107 *Ohio St.* 475, 141 *N. E.* 19, 26 (1923); *Commonwealth v. Polian,* 288 *Mass.* 494, 193 *N. E.* 68, 70, 96 *A. L. R.* 615 (1934); *Clifton v. United States, supra,* 371 *F. 2d,* at *p.* 357, *n.* 7.

In *Scott v. State, supra,* the Supreme Court of Ohio indicated that where evidence of other offenses was being properly offered on the issue of intent, the other offenses would not have to be established beyond a reasonable doubt; in the course of its opinion it discarded *Baxter v. State,* 91 *Ohio St.* 167, 110 *N. E.* 456, 458 (1914) which had apparently embraced a contrary view. 141 *N. E.,* at *pp.* 26–27; see *Caruthers v. State,* 406 *S. W. 2d* 159, 161–162 (*Tenn. Sup. Ct.* 1966); *State v. Waits,* 1 *Ariz. App.* 463, 404 *P. 2d* 729, 732 (1965); *cf. People v. Albertson,* 23 *Cal. 2d* 550, 145 *P. 2d* 7, 22 (1944). In *Commonwealth v. Polian, supra,* the Supreme Judicial Court of Massachusetts rejected the notion that a dying declaration was not to be admitted in evidence until all of its elements had been established beyond a reasonable doubt; although it cited contrary holdings elsewhere, it expressed the better view to be that "it is enough to prove by a preponderance of the evidence the necessary preliminary facts." 193 *N. E.,* at *p.* 70; *cf. State v. Monich,* 74 *N. J. L.*

522 (*E. & A.* 1906); *Donnelly v. State,* 26 *N. J. L.* 463, 502 (*Sup. Ct.* 1857); but see *People v. Tilley,* 406 *Ill.* 398, 94 *N. E.* 2d 328, 331–332 (1950).

When dealing with confessions, the holding in *Clifton v. United States, supra,* 371 *F.* 2d 354, finds support in some cases but not in others. *Compare People v. Golson,* 32 *Ill.* 2d 398, 207 *N. E.* 2d 68, 70 (1965), *certiorari* denied 384 *U. S.* 1023, 86 *S. Ct.* 1951, 16 *L. Ed.* 2d 1026 (1966) *with State v. Carter,* 33 *Wis.* 2d 80, 146 *N. W.* 2d 466, 471 (1966). Indeed most of the recent decisions impose on the trial judge the responsibility of finding the confession's admissibility beyond reasonable doubt although they apparently speak in terms of preferable practice rather than constitutional requirement. See, *e. g., State v. Keiser,* 274 *Minn.* 265, 143 *N. W.* 2d 75 (1966) where the court noted that because of the devastating nature of a confession "it would seem only fair to say that on the issue of voluntariness a mere *prima facie* showing or a preponderance of the evidence should not satisfy the court." 143 *N. W.* 2d, at p. 79. See also *United States v. Inman,* 352 *F.* 2d 954, 956 (4 *Cir.* 1965); *People v. Huntley,* 15 *N. Y.* 2d 72, 78, 255 *N. Y. S.* 2d 838, 843, 204 *N. E.* 2d 179, 183 (1965); *State v. Ragsdale,* 249 *La.* 420, 187 *So.* 2d 427 (1966), *certiorari* denied 385 *U. S.* 1029, 87 *S. Ct.* 758, 17 *L. Ed.* 2d 676 (1967); but *cf. State v. Brewton,* 238 *Or.* 590, 395 *P.* 2d 874 (1964).

In *Jackson v. Denno,* 378 *U. S.* 368, 84 *S. Ct.* 1774, 12 *L. Ed.* 2d 908 (1964), the Supreme Court announced a constitutional rule that "a jury is not to hear of a confession until the trial judge has determined that it was freely and voluntarily given." *Sims v. Georgia,* 385 *U. S.* 538, 87 *S. Ct.* 639, 643, 17 *L. Ed.* 2d 593, 598 (1967). Our own practice clearly fulfills this requirement, for we follow the so-called Massachusetts or humane rule under which the trial judge conducts a preliminary hearing, and if he is satisfied that the confession was voluntary he admits it into evidence, without informing the jury of his finding but instructing it to disregard the confession if it finds that the State has not proved

its voluntariness. See *State v. Smith,* 32 *N. J.* 501, 557-560 (1960), *certiorari* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961); see also *State v. Jackson,* 43 *N. J.* 148, 166-167 (1964), *certiorari* denied 379 *U. S.* 982, 85 *S. Ct.* 690, 13 *L. Ed.* 2d 572 (1965); *State v. Wolf,* 44 *N. J.* 176, 193-194 (1965); *State v. Billingsley,* 46 *N. J.* 219, 232 (1966). Nowhere in *Jackson v. Denno, supra,* was anything said to indicate that as a matter of constitutional obligation the trial judge must not only find that the confession was voluntary but must also find that the proofs before him established that fact beyond reasonable doubt. We agree with Judge Burger's understanding of *Jackson v. Denno,* as he expressed it in *Clifton v. United States, supra;* the trial judge's preliminary fact-finding procedure must be "fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend" (378 *U. S.,* at *p.* 391, 84 *S. Ct.,* at *p.* 1788, 12 *L. Ed.* 2d, at *p.* 924); but that type of determination may readily be made without invoking the reasonable doubt standard. 371 *F.* 2d, at *pp.* 356-357.

Nothing in *Miranda* or in any of the other Supreme Court holdings since *Jackson v. Denno, supra,* dictates that the trial judge's finding of admissibility be formally rested on proofs beyond reasonable doubt. Nor do we consider that the matter should be viewed as one of constitutional dimension in the light of the other substantial safeguards now afforded to defendants in all jurisdictions including those which follow the more traditional evidential principle that the reasonable doubt standard, designed to govern the "whole issue" of guilt or innocence (IX *Wigmore, supra* § 2497, *p.* 324), does not apply to the preliminary inquiry and finding on admissibility by the trial judge. See *Commonwealth v. Polian, supra,* 193 *N. E.,* at *p.* 70; *cf. State v. Billingsley, supra,* 46 *N. J.,* at *p.* 232. Notwithstanding the foregoing, the trend of the Supreme Court's recent opinions may lead to the belief that *Jackson v. Denno* and *Miranda* will be supplemented in due

course with the reasonable doubt standard and the safer course would be for our trial judges to use that standard in all future hearings on voluntariness and admissibility. This would avoid uncertainty and confusion and the danger of later unsettlement; as a practical matter, it would make little difference, for as was pointed out in the concurring opinion in *Clifton v. United States, supra,* "there is only a relatively narrow zone of cases in which a judge in a criminal matter will be 'satisfied' of voluntariness though he harbors a reasonable doubt." 371 *F. 2d,* at *p.* 364. This may be illustrated by the very case at hand for once we have carefully examined the oral testimony along with the written exhibits and have firmly credited the State's evidence and discredited the defendant's denials, as we have, we are not only satisfied of the voluntariness and admissibility of the confession but are also satisfied beyond reasonable doubt. In the exceptional instance where reasonable doubt remains though the evidence preponderates in the State's favor, the defendant may receive an additional protection not compelled by the precedents or the constitution, but in the overall the sound administration of justice may perhaps be better served. *Cf. Clifton v. United States, supra,* 371 *F. 2d,* at *p.* 363 (concurring opinion) ; *State v. Keiser, supra,* 143 *N. W. 2d,* at *p.* 79.

Reversed.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.