George F. X. McInerney, J.
This is a motion to suppress pursuant to section 813-g of the Code of Criminal Procedure. After a hearing, the court finds as facts beyond a reasonable doubt:
1. On 11 March, 1967, Detective Moon of the Arson Squad, Suffolk County Police Department, investigated a fire at a local school.
2. In the course of this investigation he spoke to the defendant, a school custodian, whom he knew by sight.
3. Four days later, at about 1:00 p.m., the defendant was brought to the police station by another officer for questioning.
4. He was seated in a room in which varying numbers of police officers and office personnel were present.
5. During a period of three to three and one-half hours the defendant remained in the room while the people there continued their usual pursuits without any questioning of the defendant.
6. At about 4:15 p.m. Detective Buckward, in civilian clothes, arrived in the defendant’s presence, asked him to follow him into a private room, which he did, and then introduced himself to the defendant.
7. He gave the defendant the four warnings mandated by the Miranda decision, and then questioned the defendant about the fire at the school.
8. The defendant at first denied any involvement in the fire, but later made some apparent admissions, and another police officer was brought into the room and the questioning continued.
9. At about 5:00 p.m. the defendant had coffee and sandwiches.
10. At about 7:00 p.m. Officer Lechmanski appeared, gave the mandated Miranda warnings to the defendant and took a statement from him, typed it, and showed it to the defendant who read it.
*562 11. The defendant pointed out an omission to the officer and initialled the correction, said the statement as typed was true and signed it.
12. The defendant left the station about 7:45 p.m. with Officer Lechmanski and stated that he knew they had him when they called him back and he thought that he had “ better give them some more ”.
13. A third officer, Smith, had briefly joined in the questioning, asking one or two questions.
14. The defendant was formally arrested about 10:00 p.m. that night.
15. Testimony of a psychiatrist and a psychologist indicated, and the court so finds, that the defendant had a standing in the border-line or dull normal range on the Wechler Adult Intelligence Scale (77 according to the psychiatrist and 83 by the psychologist), and that he was unusually suggestive, with areas of vocabulary and understanding as his greatest deficiencies.
16. During his test by the psychiatrist he was unable to name four Presidents of the United States since 1900, although he finally did name them by going backward in time from the present one.
17. He is possessed with an unusual desire to give pleasing . answers to his interrogators, especially when in the presence of authority symbols, as a result of which he has a good military record.
18. The defendant’s mother telephoned the police station where the defendant was seated about 2:30 p.m. and was informed by the person who answered that the defendant was not there.
19. She had been informed by the detective who took her son from their home .that he would be at Hauppauge Headquarters and she called information for the telephone number, wanting to talk to him and ask if he wanted a lawyer.
CONCLUSIONS
The only substantial issue presented here is the definition of ‘ ‘ intelligently ’ ’.
The Supreme Court stated that ‘ ‘ a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel ”. (Escobedo v. Illinois, 378 U. S. 478, 490, and repeated it in Miranda v. Arizona, 384 U. S. 436, 444, 475.)
The dictionary is of dubious aid. We are offered “ Intelligent — 1. having good understanding or a high mental capacity, *563 quick to comprehend, as persons or animals. 2. having the faculty of reasoning and understanding.” (Random House Dictionary, 1967.)
Intelligence itself is defined as: “ b. the capacity for knowledge and understanding, esp. as applied to the handling of novel situations; the power of meeting a novel situation successfully by adjusting one’s behavior to the total situation; the ability to apprehend the interrelationships of presented facts in such a way as to guide action towards a desired goal.” (Webster’s New International Dictionary [2d ed.].)
These definitions do not clearly present a suitable objective test to be used in determining whether a defendant intelligently waived a constitutional right of great importance to him. Intuitively one would be more convinced that the ultimate test of intelligence is the ability to survive in one’s environment, in which case it could be said that intelligence is an agglomerate of amorphous dimensions most accurately evaluated after the fact, usually to the consternation and incredulity of the less successful contenders. If the survival test be used, no one would intelligently waive any constitutional right, for in criminal proceedings one does not survive well by giving incriminatory information, since what is incriminating at the time is often only recognized after the fact, in this case, the trial. Indeed, it is difficult even for the academician to imagine a believable situation where a waiver would result in a benefit to the guilty at the usual police station interrogation. Even if one were to assume that the relief given to a harried psyche by the pouring out of one’s transgressions at that time was a valid motivation for such action, it would not meet the test of intelligence. After all, the penitent could always delay his moral catharsis until his attorney had explored the solidity of the case against him and completed his negotiating of a plea. The defendant then could confess in open court with a maximum of exposure and, presumably, mortification.
The accuracy of this observation is best established by the unanimity of opinion among criminal lawyers that their instant advice to a client being interrogated would be to refuse to waive anything pending a dispassionate evaluation of the strength of the enemy. If an intelligent specialist would so advise, then anyone who does waive is presumably acting unintelligently. Let it be here remembered that the Miranda warnings are mandated even for lawyers (384 U. S. 436, 467 — 469). A most thought-provoking directive indeed.
*564 This line of reasoning, however persuasive, leads to the inevitable result that almost every admission in the police station would be unintelligent and inadmissible.
Considering the other extreme of the spectrum of intelligence definitions, we conclude that anyone who functions to a degree commensurate with his ability is intelligent. The rational human animal reacts to a stimulus and if the reaction is considered by him and done voluntarily it would seem to be intelligent, at least for him. Yet the training of maturity cautions us to delay our reactions to the immediate stimulus and estimate what is best for us in the long run. What seems best at the time to the uninitiated most often will be the worst for him, especially in the police station. If this standard is used we are led to a realization that those least prepared to withstand the relief of the immediate for the security of the future will make most confessions. Few would maintain that this would be intelligent for a simple fact is still confronting us — an intelligent person is not going to confess if he understands the warnings given him and the permutations and ramifications of his garrulity.
This court is convinced that the concept of an intelligent waiver in the absence of an attorney at the interrogation period is an amiable fiction designed to expedite the orderly processes of society provided one not take the words too literally. In almost all pursuits of civilized life one is held, fortunately for society, not to intelligent actions, but to reasonable ones. The court is unaware of anyone who successfully avoided a marriage ceremony because his then ardor was unintelligent in the cold light of after-appraisal.
The court concludes that intelligence means the intelligence demonstrated to a reasonable degree by that panacea of the law — the reasonable man.
Such a conclusion is implicit in prior cases such as People v. Kessler (53 Misc 2d 268); People v. Golwitzer (52 Misc 2d 925); People v. Thiel (26 AD 2d 897); People v. Lacy (26 AD 2d 982); People v. Witenski (15 NY 2d 392) and Johnson v. Zerbst (304 U. S. 458).
Under this test the isolation of the defendant in the police station for a period of three to three and a half hours, his unusual psychological desire to give pleasing answers to his interrogators and his low level of understanding of semantics all militate against an intelligent waiver.
The court concludes that although the defendant acted knowingly and willingly at the police station, he did not do so intelligently.
His statements are inadmissible.