**Gilbert NICHOLI, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 948.**

Supreme Court of Alaska.

March 10, 1969.

---

William B. Emmal, Fairbanks, for appellant.

Gerald J. Van Hoomissen, Dist. Atty., Fairbanks, for appellee.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

## OPINION

NESBETT, Chief Justice.

Appellant was indicted for manslaughter, the indictment charging that he killed Lillian Malcolm by beating her about her body with his fists or with an instrument or instruments unknown to the grand jury.

Disclosure of the fact of deceased's death was first made by appellant to Ed Merck, owner of the Sunset Strip Club, in Fairbanks, Alaska at about 6 a. m. on October 10, 1965. Merck testified that appellant came to his bar at the early hour on Sunday morning crying, stating that he had discovered Lillian at his home and that he had touched her and shook her but that she wouldn't move. Merck contacted Attorney William Emmal who contacted the police. Upon checking appellant's cabin at about 11 a. m. October 10, officers of the state police, accompanied by Attorney Emmal, found deceased's body lying on the bed covered with "discoloration marks." Dr. Evans testified that he had found some 200 bruises on deceased which were inflicted before death, possibly by fists or feet. Death resulted from the separation of the mesentery from the colon caused by a severe force being exerted on the lower abdominal cavity, the force being from both the front and the back and being consistent with someone jumping on deceased's abdomen.

At about 2 p. m. on October 10, 1965, State Troopers Hussey and Lucking interviewed appellant at police headquarters. Attorney Emmal was present. Prior to any conversation with appellant he was advised that he did not have to talk to the police, that he had the right to be represented by counsel at all times, and that anything he said would be used against him. At this point in the warning Attorney Emmal stated that for the purposes of the interview he would be representing appellant. Trooper Hussey testified that appellant may have had a hangover but was not intoxicated, and that he answered all questions and appeared to understand the proceeding. Trooper Lucking testified that appellant

was very weary and tired and when asked the question, "Q. Hung-over, drunk?" responded, "A. Might have been, yes." In answer to further questions the trooper stated that he was sure that appellant understood what was being asked of him.

In the hearing held before the court, out of the presence of the jury, for the purpose of determining whether statements made by appellant during this interview and at a later date at a coroner's inquest should be admitted into evidence, appellant testified that he remembered being at police headquarters, but didn't remember how he got there; that he remembered Attorney Emmal telling him that he didn't have to make a statement but that he did not actually realize that he didn't have to make a statement and that he remembered his warning but since the officers kept asking him questions he answered them. Appellant repeatedly stated, "I didn't know my rights. I just didn't quite understand them." Appellant admitted that he had been arrested "several times" in the past; that he had been before court and had been advised of his rights; that he understood his rights "but when they tell me to uh—you have a right to uh—being present, to hire an attorney, well, I—I have no money to hire an attorney * * * in a lot of cases and this * * * this—this particular case I didn't even have a place to stay or anything."

The trial court found that although appellant may not have had a whole comprehension of the constitution and the background reasons for its provisions, that he had sufficient common understanding to realize that he didn't have to make any statement and that he was entitled to be represented by counsel. The court found that no advantage had been taken of appellant and that he had an understanding and recollection of matters that "supposedly occurred at a time when he was getting so drunk—as he has represented here to be—that he couldn't know what was being asked of him." The court ruled that ap-

pellant's statements at the interview on October 10 and his testimony on October 25 at a coroner's inquest were admissible in evidence and this ruling is the basis for appellant's first claim of error.

*The Interview*

Appellant's statements, as related by Troopers Hussey and Lucking, were that he had been drinking wine with deceased on the evening of October 9;[1] that they had dinner and then had an argument over grocery money; that his last memory at that point was that a radio was playing and the candle by which the cabin was lighted flickered and grew dim; that he awakened later to find the cabin dark; that he went over to the bed and found deceased not breathing; that he then shook her, pushed on her chest and stomach, and blew in her mouth in an attempt to revive her, without success; that he then went downtown and drank in a bar until the bars closed after which he returned to his cabin; that he remained inside his cabin while firemen fought a fire in a nearby cabin and did not answer the door when someone attempted to warn the occupants of his cabin of danger; and that when the fire fighting equipment left he took a cab to the Sunset Strip Club to seek the advice of Ed Merck, who was his part-time employer.

Appellant devotes very little argument to his claim that the trial court erred in permitting Trooper Lucking to relate at the trial the substance of his statements made at the interview at police headquarters at 2 p. m. on October 10, 1965. Appellant emphasizes the fact that he was "hung over," weary, and tired and contends that his statements were not the product of his free will and rational intellect and were therefore involuntary.

We affirm the trial court's holding that the statements made were admissible in evidence. It is undisputed that appellant was adequately warned of his rights and that he was represented by counsel through-

1. Other testimony established that appellant and deceased were living together at appellant's cabin in Fairbanks.

out the interview. While it is not disputed that appellant was *suffering from a hangover*, a study of the transcript of appellant's testimony leaves the definite impression that he understood his rights as they were explained to him; that he had a full understanding of the purpose of the interview and that he voluntarily participated. The state points out that appellant and his counsel came to the police headquarters voluntarily on October 10 when the interview was conducted. They were not asked to come to police headquarters. The interview, by appellant's testimony, lasted no more than two or three hours.

*The Coroner's Inquest*

. ■ Appellant was subpoenaed to appear at the coroner's inquest conducted on October 25, 1965. He was first advised that he was not obliged to answer any questions, that he had a right to remain silent, that he had a right to be represented by an attorney, and was asked if he understood. His reply was "Yes" and he further stated, in answer to a question, that he was willing to give information to the jury concerning Lillian Malcolm's death. He then testified that he and deceased had been acquainted for about five years and were living together; that he worked at the Sunset Strip Club until 6 p. m. on October 9; that he had been drinking on the job; that after work he received his pay and went to the cabin where he and deceased were living; that deceased prepared supper; that they had a quart of Gallo wine to drink and that he became drunk. The balance of his testimony was essentially the same as that related during the interview with Troopers Hussey and Lucking at police headquarters 15 days previously on October 10.

Appellant argues that the above testimony was involuntary in that, although he was

advised of his rights, he did not really understand them; that he was uneducated, having completed schooling only through the 7th grade, and that since he was subpoenaed he thought that he had no alternative but to testify. Appellant stated:

Well, I had been under threats before with a warrant would be served to me if I didn't say anything so I had that in mind. Some police officer was going to serve me a warrant if I didn't tell the truth or if I didn't tell 'em somethin'; they said they'd tear the warrant up if I told 'em.[2]

We hold that the trial court committed no error in permitting a transcript of appellant's testimony before the coroner's jury to be read to the jury. Appellant was not under arrest or in custody or under any type of restraint. There is no claim that he was intoxicated. Although he had been subpoenaed to appear, he was clearly advised that he could refuse to answer any questions and that he had the right to be represented by counsel. He stated that he understood the warning and that he was willing to give information to the jury. The fact that appellant had only completed the 7th grade in school, standing alone, is not controlling. No fixed amount of formal education is required to comprehend the simple statement of rights given to appellant.[3]

Although the statements made by appellant during the interview at police headquarters and at the coroner's inquest were not confessions, they were against his interest in the sense that they helped to complete a chain of circumstantial evidence of guilt.

■ It is clear enough that the warning given to appellant prior to his interview at police headquarters satisfied the requirements of Miranda v. Arizona[4] even though

---

**2.** Appellant testified that Trooper Hussey during the interview had stated to him that, " 'You're a #1 suspect so you'd better come up with something' or something like that. I don't know."

**3.** *See* State v. Mayabb, 316 S.W.2d 609, 611 (Mo.1958); Miranda v. State, 42

Ariz. 358, 26 P.2d 241, 244 (1933); Maki v. State, 18 Wyo. 481, 112 P. 334, 33 L.R.A.,N.S., 465 (1911).

**4.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

he was not advised that if he was indigent counsel would be furnished him at state expense. It was unnecessary to give this aspect of the warning since Attorney Emmal was present and stated that he was representing appellant at the interview. Appellant's objection to having statements made at the interview placed before the jury is that, although warned, he still did not fully understand his rights. Appellant's legal position is similar in many respects to that of the appellant in State v. McKnight [5] where it was sought to suppress statements made after an adequate warning on the ground that appellant did not understand the full implication of the statements made. Chief Justice Weintraub, speaking for the full court stated, at 243 A.2d 250:

"The case at hand involves, not the trial stage, but rather the detectional stage of law enforcement. Truth here is the aim as it is at the trial stage, but rights suitable to assure the truth at trial could block it during an investigation. Different values are involved. When the guilty go undetected, or, if detected, are nonetheless set free because plain evidence of guilt is suppressed, the price is exacted from what must be the first right of the individual, the right to be protected from criminal attack in his home, in his work, and in the streets. Government is constituted to provide law and order. The Bill of Rights must be understood in the light of that mission.

There is no right to escape detection. There is no right to commit a perfect crime or to an equal opportunity to that end. The Constitution is not all offended when a guilty man stubs his toe. On the contrary, it is decent to hope that he will. Nor is it dirty business to use evidence a defendant himself may furnish in the detectional stage. Voluntary confessions accord with high moral values, and as to the culprit who reveals his guilt unwittingly with no intent to shed his inner burden, it is no more unfair to use the

evidence he thereby reveals than it is to turn against him clues at the scene of the crime which a brighter, better informed, or more gifted criminal would not have left. Thus the Fifth Amendment does not say that a man shall not be permitted to incriminate himself, or that he shall not be persuaded to do so. It says no more than that a man shall not be "compelled" to give evidence against himself.

Hence while we are solicitous of the right to counsel at the trial stage to the end that a defendant shall not suffer injustice because he is not equipped to protect himself, it would be thoughtless to transfer the same right to counsel to the detectional scene. If it be granted that a man may seek legal advice as to how to avoid detection, it is not because the Constitution guarantees him that right. Surely *Miranda* does not say that a man's deed or word may not be used against him merely because he was unaware of its incriminating thrust, State v. Aiken, Wash., 434 P.2d 10, 26 (Sup.Ct.1967), or unless he first rejected an opportunity for advice by counsel. Cf. Ballay v. People, [160] Colo. [309], 419 P.2d 446 (Sup.Ct.1966). A man could not escape his confession to a friend or relative because he thought that what he said did not constitute proof of a crime or that the friend or relative could not testify against him. It is consonant with good morals, and the Constitution, to exploit a criminal's ignorance or stupidity in the detectional process. This must be so if Government is to succeed in its primary mission to protect the first right of the individual to live free from criminal attack.

As we understand *Miranda*, its focus was upon the right not to be "compelled" to incriminate one's self and upon nothing else. *Miranda* did not find that the constitutional right to counsel which exists at the trial stage obtains with the same sweep during the State's pretrial investigation. On the contrary, *Miranda* expressly sustains confessions made by a suspect who is not in "custody or otherwise deprived of his

5.  52 N.J. 35, 243 A.2d 240 (1968) (Footnote omitted).

freedom of action in any significant way" (384 U.S. at p. 444, 86 S.Ct. at p. 1612, 16 L.Ed.2d at p. 706), notwithstanding there was no counsel, or advice as to a right to counsel, or even an awareness of the Fifth Amendment privilege. The warning *Miranda* requires with respect to the right to counsel was fashioned, as we understand the opinion, solely to counteract the coercion of custodial interrogation. The prisoner so situated is to be advised of a right to counsel to the end that he will feel free to say nothing which may incriminate him. Accordingly *Miranda* expressly says that the warnings it devised need not be given if "other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it" (384 U.S. at p. 444, 86 S.Ct. at p. 1612, 16 L.Ed.2d at p. 706).

Nor does *Miranda* say that the test of "waiver" is the one applicable when the issue is the right to counsel at trial or on a plea of guilty. On the contrary, *Miranda* says that if the defendant is told of his "right to silence," of the hazard of incrimination if he speaks, and of his right to a lawyer's presence, at public expense if he is indigent, then "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a satement could constitute a waiver." 384 U.S. at p. 475, 86 S.Ct. at p. 28 [1628], 16 L.Ed.2d at p. 724. See State v. Yough, 49 N.J. 587, 596–597, 231 A.2d 598 (1967); Tucker v. United States, 375 F.2d 363 (8 Cir. 1967). Nowhere does *Miranda* suggest that the waiver of counsel at the detectional stage would not be "knowing" or "intelligent" if the suspect did not understand the law relating to the crime, the possible defenses, and the hazards of talking without the aid of counsel, or if the suspect was not able to protect his interests without such aid, or, in terms of the plurality opinion in *Von Moltke*, [Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948)] if it was not "wise" of the prisoner to forego counsel or the

right to silence. See People v. Lara, [67 Cal.2d 365] 62 Cal.Rptr. 586, 432 P.2d 202, 210 (Sup.Ct.1967); State v. Aiken, supra, Wash., 434 P.2d 10, 26, 33; cf. People v. Roman, [256 Cal.App.2d 656] 64 Cal.Rptr. 268 (Dist.Ct.App.1967); People v. Lux, [56 Misc.2d 561] 289 N.Y.S.2d 66 (Co.Ct. 1967). However relevant to "waiver" of the right to counsel at trial or in connection with a plea of guilty, those factors are foreign to the investigational scene where the detection of the guilty is the legitimate aim.

Hence if a defendant was given the *Miranda* warnings, if the coercion of custodial interrogation was thus dissipated, his "waiver" was no less "voluntary" and "knowing" and "intelligent" because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. A man need not have the understanding of a lawyer to waive one. Such matters, irrelevant when the defendant volunteers his confession to a friend or to a policeman passing on his beat, are equally irrelevant when the confession is made in custody after coercion of custodial interrogation has been dispelled by the *Miranda* warnings. With such warnings, the essential fact remains that defendant understood he had the right to remain silent and thereby to avoid the risk of self-incrimination. That is what the Fifth Amendment privilege is about."

■ Since appellant was not under arrest or in custody or under any type of restraint at the time he made his statement at the coroner's inquest, it was not necessary that he have been advised that if he was indigent and so desired counsel would be furnished for him at state expense.[6]

■ It is clear enough from the evidence that neither of the statements was involuntary. In commenting on the amount

6.  Beckley v. State, 443 P.2d 51, 53–54 (Alaska 1968).

of pressure required to render a statement involuntary the Supreme Court of the United States, in Stein v. New York,[7] said:

> The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.

There is no evidence of the employment of strong pressure to overcome appellant's power of resistance with respect to either of the statements.

■ Lastly, appellant claims that the trial court erred in admitting evidence of a prior assault by appellant upon deceased.

Over appellant's objection Glen Traxler was permitted to testify that in June of 1963 appellant and deceased were living in his home; that on one occasion when they entered the house after a visit uptown appellant struck deceased two or three times and while she was bloody and lying on the floor he kicked her several times and that while he, Traxler, was advising the authorities of the incident, appellant summoned an ambulance which delivered deceased to the hospital.

The evidence was admitted on the ground that the nature of the abuse inflicted upon deceased by appellant in June of 1963 was so brutal and unusual and so unlikely to occur in the ordinary course of events and bore such a similarity to the abuse which must have been inflicted upon deceased on October 9, 1965, that when considered by the jury in relation to the balance of the evidence, it might tend to establish the identity of the assailant as being appellant.

This court has held that evidence of other offenses is inadmissible when relevant merely to show criminal disposition but is admissible when relevant to prove some other material fact.[8]

Here the particular facts of the beating administered by appellant in June of 1963 were substantially relevant to the question in issue, which was whether appellant administered the beating which resulted in deceased's death on October 9, 1965. The nature of the abuse inflicted in each case was so brutal and unusual and similar that the court was warranted in submitting the facts of the June 1963 assault to the jury as relevant evidence of the identity of the assailant of October 9, 1965.[9]

The judgment below is affirmed.

RABINOWITZ, Justice (dissenting).

I cannot agree with the majority's holding that Glen Traxler's testimony was properly admitted into evidence.

In Watson v. State[1] we said that evidence which

> reveals the commission of an offense other than that for which the defendant is being tried is inadmissible if it is relevant merely to show criminal disposition. But such evidence is admissible, even when it shows the defendant's prior trouble with the law, when it is relevant to prove some other material fact.[2]

---

7. 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522, 1542 (1952).

8. Gafford v. State, 440 P.2d 405 (Alaska 1968); Watson v. State, 387 P.2d 289, 293 (Alaska 1963).

9. *See* People v. Peete, 28 Cal.2d 306, 169 P.2d 924 (1946), *cert. denied*, 329 U.S. 790, 67 S.Ct. 356, 91 L.Ed. 677, *reh. denied*, 329 U.S. 832, 67 S.Ct. 490, 91 L.Ed. 705, *cert. denied*, 331 U.S. 783, 67 S.Ct. 1185, 91 L.Ed. 1815, cited by this court in Watson v. State, 387 P.2d 289, 293 (Alaska 1963).

I. 387 P.2d 289, 293 (Alaska 1963) (footnote omitted).

2. In support of this statement, we cited in part Rule 55, Uniform Rules of Evidence, which provides that:

> Subject to Rule 47 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed another crime or civil wrong on another specified occasion but, subject to Rules 45 and 48, such evidence is admissible when relevant to prove some other material fact including absence of mistake or accident, motive,

We have adhered to this rule in our subsequent decisions in Kugzruk v. State [3] and Gafford v. State.[4] In both of these cases we recognized exceptions to general rule which bars evidence of other independent criminal acts of an accused. In the *Kugzruk* and *Gafford* cases we also held that not only must such evidence fall within one or more of the established exceptions to the general bar but additionally, the trial judge must balance the relevance and probative value of such disputed evidence against its prejudicial impact before deciding upon its admissibility.[5] In the case at bar, Traxler's evidence does not fall within any recognized exception to the general rule and the relevance and probative value of his evidence was significantly outweighed by its prejudicial impact.

The prosecution's case against appellant was entirely circumstantial. Dr. Raymond Evans testified that he performed the autopsy upon the body of the deceased. According to the doctor's testimony, he observed some 200 bruises over Lillian Malcolm's entire body, all of which were inflicted prior to her death. He further stated that these bruises could have possibly resulted from blows rendered by fists or feet. As to the cause of death, this witness stated that a forceful blow, consistent with someone jumping on the victim's abdomen, resulted in the separation of the mesentery from the bowel.

When viewed against the objective finding of Dr. Evans concerning the October 1965 fatal beating of the deceased, I can discern no basis for the admission of Glen Traxler's testimony. Traxler related that in June of 1963, some two and one-half years prior to the death of Lillian Malcolm, both she and appellant were living in his house in Fairbanks. Traxler further testified that in June of 1963 appellant and the decedent had been "uptown" and had come home but that after they returned, appellant hit her; that the decedent was "all bloody"; that appellant hit her two or three times and kicked her two or three times when she was down. Traxler also stated that the deceased was taken to the hospital in an ambulance which was summoned by appellant and that the entire altercation lasted a minute or two.

At the trial the prosecutor successfully argued that Traxler's evidence was admissible under the exception which permits evidence of this character to show the identity of the assailant.[6] As stated by Professor McCormick, this exception is used to prove other like crimes by the accused so nearly identical in method as

---

opportunity, intent, preparation, plan, knowledge or identity.

3. 436 P.2d 962, 967 (Alaska 1968).

4. 440 P.2d 405, 408 (Alaska 1968).

5. In Kugzruk v. State, 436 P.2d 962, 967 (Alaska 1968) (footnote omitted), we said in part that "In our opinion the relevance and probative value of witness Thisby's evidence outweighed its prejudicial impact." Cited in connection with this statement was Harper v. United States, 99 U.S.App.D.C. 324, 239 F.2d 945, 946 (1956), where it was said: Sometimes, however, it is helpful to analyze the law into its basic elements. Thus analyzed, the rule is that evidence of other offenses is admissible when substantially relevant to the offense charged; inadmissible when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it * * *.

See also C. McCormick, Evidence § 157, at 332.

6. Prior to Traxler's giving any testimony, the prosecutor informed the trial judge that this witness' testimony would show that both Lillian Malcolm and appellant had been drinking and that they were intoxicated; that something had happened "downtown" which upset appellant; and that when questioned by the police, appellant said he could not remember, "he kind of blanked out." The prosecutor concluded his argument on the objection to Traxler's proposed testimony by informing the trial judge that the only difference between the 1963 and the 1965 incident was that in the latter there were no witnesses and the victim died.

Comparison of Traxler's actual testimony with the prosecutor's summary of what the witness would testify to discloses significant variations.

to ear-mark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinct as to be like a signature.[7]

I cannot find, as does a majority of this court, that the "nature of the abuse inflicted" in the 1963 and 1965 beatings "was so brutal and unusual and similar" as to warrant the admission into evidence of Traxler's testimony concerning the 1963 beating. There is nothing so unusual or distinctive in the 1963 beating, when compared with the 1965 beating, which meets the identity exception criterion. Pertinent here is the fact that Dr. Evans testified the 1965 beating resulted in over 200 bruises to the deceased's body, that these bruises could have possibly been made by fists or feet, and that a blow, consistent with someone jumping on the deceased's abdomen, caused her death. This is far removed from Traxler's testimony as to two or three blows and two or three kicks having been administered by appellant to the deceased over two years prior to her death. I, therefore, conclude that Traxler's testimony did not come within the identity exception to the general rule under discussion.

Assuming a borderline question, I am of the further opinion that the prejudicial effect of this evidence far outweighed any relevance and probative value it might have possessed. I, therefore, conclude that the trial court abused his discretion in overruling appellant's objection to the reception of this evidence. The prosecution's case against appellant was entirely circumstantial and, as the trial judge remarked on more than one occasion, was not of the strongest type. In such a context, admission of Traxler's testimony was prejudicial error.

In light of the foregoing, I conclude that the judgment and commitment should be set aside and appellant granted a new trial.[8]

---

7. C. McCormick, Evidence § 157, at 328.

8. In reaching this conclusion, I find it unnecessary to base my decision to reverse upon a portion of an instruction the trial court gave the jury concerning Traxler's testimony. In its instruction the trial court said:

> The value, if any, of such evidence depends upon whether or not it tends to show the identity of the person who committed the alleged crime in

question in this case, *or whether or not it tends to show the mental and physical capacity and propensity of the defendant to commit the crime charged in the manner alleged.* (Emphasis added)

It would appear that the emphasized portion of the court's instruction enabled the jury to consider Traxler's evidence as to the 1963 assault for the very purposes the exclusionary rule was fashioned to prevent.