284-290

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. HUBERT
JOHNSON, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 2, 1986—Decided June 10, 1987.

Before Judges BRODY, LONG and D'ANNUNZIO.

*Brian W. Mason*, Assistant Essex County Prosecutor, argued the cause for appellant (*Herbert H. Tate, Jr.*, Essex County Prosecutor, attorney; *Brian W. Mason*, of counsel and on the letter brief).

*Peter M. Jacques*, Assistant Deputy Public Defender, argued the cause for respondent (*Alfred A. Slocum*, Public Defender, attorney; *Peter M. Jacques*, of counsel and on the brief).

The opinion of the court was delivered by

BRODY, J.A.D.

We granted the State leave to file this appeal from an order suppressing an incriminating written statement that defendant had given the police. The statement had been the State's chief evidence in a trial at which the jury found defendant guilty of murder and possession of a weapon for an unlawful purpose. Before imposing sentence, however, the trial judge granted defendant's motion for a new trial on the ground of newly discovered evidence that bore on the voluntariness of the statement. The new evidence led the judge to suppress the statement.

Arthur Lytle's bullet-riddled body was found on August 26, 1984, near Jack's Tavern on 14th Street in Newark. Police suspected that people engaged in the drug trade used the tavern as a place to meet. Several unsolved murders and assaults had occurred there. Sergeant Charles Whitner and Detective Gary Miller of the Newark police homicide squad were assigned to find Lytle's murderer. Their investigation produced a single lead: informers believed that shortly before he was killed, Lytle (who was also known as Hasaan) had robbed defendant. The detectives kept a lookout for defendant and finally found him months later in the Newark jail.

When Newark homicide detectives go on duty, they routinely examine a sheet containing the names of people who had been arrested in Newark within the past 24 hours. When Sergeant Whitner and Detective Miller went on duty Christmas day 1984 they saw defendant's name on the list. He had been arrested for a drug offense unrelated to the homicide.

There is undisputed documentary evidence that after seeing defendant's name on the 24-hour arrest sheet, the detectives then went to defendant's cell and signed him out to their custody at 10:05 a.m. They brought him to the nearby homicide squad room for questioning. Defendant signed a written waiver of his *Miranda* rights at 12:39 p.m. that the detectives had prepared at 12:30 p.m. His written statement is in the

form of typewritten questions and answers. It begins with the notation "Statement Began: 1250 hours." All other material evidence bearing on the issue of voluntariness rests upon the credibility of the two detectives and defendant.

Defendant first raised the issue of voluntariness at a *Miranda* hearing (the first *Miranda* hearing) conducted on November 7, 1985, the day before his trial. Sergeant Whitner did not testify at that hearing or at the trial because he was on vacation.

Detective Miller was the State's only witness at the first *Miranda* hearing. On his direct testimony he was asked what he did after seeing defendant's name on the 24–hour arrest sheet. He replied that he and Sergeant Whitner brought defendant to the squad room from the cell-block, advised him of his rights, had him sign the written waiver of *Miranda* rights and advised him that he was a suspect in the Lytle homicide. Detective Miller testified that at first defendant denied participation in the crime, but then gave the written statement after the detective had told him that "the word is out in the street ... that the decedent had stuck him up for some money and drugs ... and he had Hasaan killed...." Detective Miller further testified that defendant was not physically harmed, threatened or given any promises.

Defendant's written statement contains a detailed recital of his robbery. It describes how on August 23, 1984, Lytle rode up to him on a bicycle and asked for a quarter gram of cocaine. When defendant produced the "coke" from the "stash" where he had it hidden,

> Hasaan pulled his pistol out and stuck it in my stomach, and said "You know what this is." He took the quarter gram of coke and about eighty or ninety dollars. Then Hasaan got on his bike and rode off.

The statement then describes in detail how defendant arranged for Lytle's murder. The day after the robbery he met Sylvester Johnson (Sylvester) in the Bronx and told him of the robbery. He had first met Sylvester three months earlier "in the Lincoln Correctional Center on 110th Street and Central

Park, in New York City." Defendant gave Sylvester a .32 caliber revolver with which Sylvester agreed to kill Lytle. "I told him that Hasaan was on 14th Street riding his bike." Two or three days later Sylvester reported to defendant that he had met Lytle

> on 14th Street, near Jack's Tavern. They hugged each other and talked, then he shot him 3 times and when he fell he shot him three more times.

Detective Miller testified that he and Sergeant Whitner verified defendant's story by having him identify a picture of Sylvester.

> And we called Records and had a record check made of Sylvester Johnson and Records gave us a gallery number. And we called down to our Photo Room and had them make up a picture of Sylvester Johnson.
>
> And when they were ready they let us know and Detective Whiten went down to the Photo Room and got the picture and brought it back up.

The detectives also obtained five photographs of other men and marked each with an identification number. They then placed the six photographs before defendant and asked him to pick out the photograph of Sylvester and state its identification number. Defendant selected the correct photograph. His statement describes this procedure and includes his identification of Sylvester's photograph by number. All six photographs were admitted into evidence.

On cross-examination Detective Miller gave untrue testimony about when he and Sergeant Whitner removed defendant from his cell and about how long they had questioned him before defendant gave his written statement. When he testified Detective Miller obviously had forgotten that the cell-block log sheet showed that he and Sergeant Whitner had removed defendant from his cell at 10:05 a.m. The critical testimony follows:

> Q. You brought this man over to the squad. What time did you bring him over?
> A. Just prior to me giving him the Miranda.
> Q. What is the time indicated on your Miranda?
> A. Pardon?
> Q. What time is indicated on your Miranda?
> A. 12:30.

. . . .

Q.  Now at that time how much before 12:30 which is the time you started, I would assume you started to read this Miranda to him?

A.  When we came in we gave him his Miranda.

Q.  That is the very first thing you did was read him this?

A.  Yes.

Q.  That was 12:30, right?

A.  Yes.

Q.  And he signed it at 12:39. Is that correct?

A.  Yes.

Q.  And you are saying that that statement according to what has been marked started at 12:[5]0?

A.  Yes.

Q.  Is that correct?

A.  Yes.

Q.  Then you are telling this Court that you had not discussed this case with Mr. Johnson prior to reading the Miranda Rights to him. Is that correct?

A.  Yes.

Q.  And you only discussed this case with him after reading him his Miranda Rights which ended at 12:39?

A.  Yes.

Q.  And the statement commenced at 12:50. So that meant there was only eleven minutes, is that right, that you had to talk to Hubert Johnson?

A.  Yes.

Q.  And that during the course of those eleven minutes, you were able to relate to him the fact that all this information is out on the street, and that he is a suspect, and that the information out on the street that you had him hit and that there are people out there who are saying that the reason it happened is because there was a drug ripoff or a robbery of some sort where you were the victim, and that is why you had Litel hit, am I right?

A.  Yes.

Q.  And you are saying that you had enough time to get questions and answers of Hubert Johnson to formulate enough information to reduce it into a typed statement?

A.  Yes.

Q.  All that took place in eleven minutes?

A.  Yes.

Q.  And you told him that he was being investigated for a murder, right?

A.  Yes.

Q.  And all he said to you was I don't know nothing about it and you are telling us that in less than eleven minutes of this little bit of interrogation, all of a sudden here is a guy who was in jail for just a drug case and is now suddenly confessing to being involved in a murder?

A.  Yes.

. . . .

Q. Isn't it a fact, Officer, that you brought Mr. Johnson over to the cell—brought Mr. Johnson over [from] the cell block much earlier that day?

A. No, it isn't.

Q. It is not? Do you have the log sheets when you signed him out of the cell block?

A. No, I don't.

Q. Are they available, do you know?

A. They are at the cell block.

The log sheet showing that Sergeant Whitner and Detective Miller signed defendant out of the cell block at 10:05 a.m. was the "newly discovered evidence" that defendant's attorney first presented to the court after the trial in support of defendant's successful motion for a new trial.

The State now concedes that Detective Miller's testimony was untrue because the officers did not remove defendant from his cell a few minutes before 12:30 p.m. They removed him at 10:05 a.m. Thus defendant was in their custody about two hours, not merely eleven minutes, before he began to give the written statement.

One can draw at least two inferences from Detective Miller's testimony. He may have forgotten what time the officers removed defendant and thoughtlessly went along with defense counsel's leading questions, or he may have remembered that he and Sergeant Whitner had defendant in their custody for about two hours before he gave his written statement and deliberately concealed this fact to give the impression that they did not have time to coerce the statement from him. Neither inference reflects credit on the witness. The former inference renders the witness subject to severe censure but does not affect the admissibility of the statement. The latter inference would render the statement involuntary and therefore inadmissible.

A trial judge must suppress a statement if he has a reasonable doubt that it is voluntary. *State v. Yough*, 49 *N.J.* 587, 600–601 (1967). The trial judge found that he had a reasonable doubt so we must first examine all the relevant

evidence to determine whether the latter inference may fairly be drawn as a basis for reasonable doubt.

Defendant testified after Detective Miller at the first *Miranda* hearing. He testified that the officers picked him up "around ten, 10:30." After he told the officer he knew nothing about the homicide, one of the officers "was beating me with a telephone book, him and his partner punching me on my body." He agreed with his attorney that the officers screamed at him. He further testified on direct examination that after he refused to confess to the homicide, they took him to another room:

A. When I thought they was taking me back to the cell block they took me from the desk, the chair I was sitting at, they took me as if I was going back down stairs.

Q. Were you handcuffed?

A. Yes.

Q. What happened?

A. They took me in a little room, they handcuffed my hands up against the wall, pulled my pants down and tried to stick a nightstick up my ass.

. . . .

Q. And then what did you do?

A. I told them I'd sign anything because I didn't want them to stick no bat up my ass. And they took me back upstairs. He wrote up the statement and had me sign it.

Q. What time did this happen?

A. 12:39.

Q. Is that when you signed the Miranda warnings?

A. Yes, and the statements.

Q. What?

A. And the statement.

On cross-examination defendant gave additional detail about being hit with a phone book and testified that the night stick had penetrated his anus "[l]ess than a half inch" when he agreed to sign a statement:

Q. How long was this going on if you can remember?

A. After they did this and I seen they was sincere, this is when I told them I would sign the statement.

Q. And then what did they do? Did someone give you a statement to sign?

A. They took me back to the desk. They had already brought it up and they gave me those papers and I signed them.

Q. So up to the time that they shoved the stick into your anus you hadn't said anything to them. Is that correct? That is correct, is that right?

A. Yes.

Q. And after you realized that they were serious and they were shoving the stick into you, it was at that point that you said, I will sign anything. Is that right?

A. Right.

Q. And who brought the papers for you to sign to you at that time?

A. The officer here.

Q. I'm sorry.

A. The officer sitting here.

Q. Detective Miller?

A. Yes.

Q. And about how much time went by between the time that they shoved, that someone shoved the stick into you, from that time till the time you actually put your signature on the papers, how much time went by?

A. Less than a couple of minutes.

Q. Just a couple of minutes?

A. Yes.

Q. And after you signed the papers what happened then?

A. They took me back to the cell block.

. . . .

THE COURT: Do I gather then that this statement was prepared without you giving them any information?

THE WITNESS: Yes.

THE COURT: Had you ever been incarcerated in New York?

THE WITNESS: Yes, sir.

THE COURT: Whereabouts?

THE WITNESS: I was in a different prison but I was at the Halfway House on 110th Street at Lincoln Correction Center.

THE COURT: Did you meet a Sylvester Johnson there?

THE WITNESS: Yes, sir.

THE COURT: How would the police know that if you didn't tell them?

THE WITNESS: How would they know? They already knew when they came to me, sir.

THE COURT: That you had met him?

THE WITNESS: No, that we was seeing each other on the streets. They said they know the whole story. They already got the whole story.

THE COURT: I have nothing further.

Following defendant's testimony, the trial judge found that his statement was voluntary beyond a reasonable doubt and it was used to convict him at the trial.

In granting the motion for a new trial the trial judge rejected the State's argument that at the *Miranda* hearing defendant's attorney had referred to the cell-block log sheet and therefore it did not qualify as newly discovered evidence. The judge was obviously disturbed that the log sheet showed that Sergeant Whitner and Detective Miller had removed defendant from his cell at 10:05 a.m. and not shortly after noon as Detective Miller had testified. The judge's reasons for granting the motion were brief:

THE COURT: All right. Material. The discussion about the time period is material. It's relevant. Accordingly, the motion for a new trial is granted.

[DEFENDANT'S ATTORNEY]: Thank you.

THE COURT: I want you to report, Mr. [assistant prosecutor]—

[ASSISTANT PROSECUTOR]: Yes, sir.

THE COURT: —to [the prosecutor], the testimony together with the log book. Do you understand?

[ASSISTANT PROSECUTOR]: I understand. You don't have to order me to do it. It's a matter of course any time we have an extraordinary remedy that is granted we immediately report that.

THE COURT: Tell [the prosecutor] I'm concerned about the testimony, vis-a-vis the log book.

[ASSISTANT PROSECUTOR]: Just for the record, I think that it was very, very honest of the officer to tell defense counsel they could go to get their evidence. He was very frank about that.

THE COURT: No question.

[ASSISTANT PROSECUTOR]: He didn't try to hide it.

THE COURT: I said I'm concerned about the time interval, because I was given the impression that he was taken out [of] the cellblock a few minutes before.

Additional testimony on the issue of voluntariness was taken at a second *Miranda* hearing before the retrial, which resulted in the suppression order under appeal. Sergeant Whitner and Detective Miller testified for the State. Their testimony need only be summarized.

Sergeant Whitner testified that he and his partner removed defendant from the cell-block about 10:00 a.m. After bringing him to the homicide squad room, the sergeant advised defendant orally of his *Miranda* rights. The sergeant then began to talk to defendant about various serious crimes that had oc-

curred at Jack's Tavern including the murder of Lytle. At one point he permitted defendant to telephone his wife. He and his partner were interrupted in their questioning of defendant by various other police matters because they were part of a skeleton crew that was on Christmas duty. After defendant expressed a willingness to give a written statement, Detective Miller typed the questions and defendant's answers. The statement was completed about 2:00 p.m. after which defendant was returned to his cell. Whitner testified that defendant voluntarily gave the statement. He denied coercing or harassing defendant in any way.

At one point the trial judge rejected the State's offer of proof that Sergeant Whitner would testify to facts that demonstrate that defendant's statement contained "unique qualities ... that could not have been fabricated by the police." The judge excluded the evidence for the reason that he was concerned with voluntariness and not the truth of the statement:

THE COURT: I am totally concerned about the voluntariness of the statement at this point.

[ASSISTANT PROSECUTOR]: Yes, sir.

THE COURT: I already commented previously during the trial on that.[1]

[ASSISTANT PROSECUTOR]: Thank you. So you do not wish the State to get into the rest of Sylvester?

THE COURT: That's correct.

Detective Miller testified to the same effect as Sergeant Whitner. He explained his earlier untrue testimony as follows:

A. Well, I was just in error. I was in error when I testified before. And now that I see this report—

Q. Does it refresh your recollection?

A. Yes.

Defendant's testimony at the second *Miranda* hearing was limited to denying that he telephoned his wife during the interrogation. Otherwise defendant's attorney was content to rely on defendant's testimony given at the first *Miranda* hearing.

---

1We have not been furnished with a full transcript of the trial.

After noting Detective Miller's untrue testimony given at the first *Miranda* hearing, the judge granted defendant's motion to suppress defendant's written statement. His findings and reasons follow:

> Now, I do recall and have the transcript of the testimony of Hubert Johnson, and a person may believe part of a witness' testimony and disbelieve part of it, I am satisfied and for the purpose of this hearing that Mr. Johnson was accurate when he said he was brought over.
>
> Now, as to what transpired after he was brought over, I'm not sure that I know. But the burden on the State is on the State ... on the question of voluntariness of the Defendant's confession will formally have to be rested on proofs beyond a reasonable doubt, the standard reasonably established in *State v. Yough,* 49 New Jersey 587, 601–602 (1967).
>
> Under the circumstances, this Court cannot say that it feels beyond a reasonable doubt that his confession was voluntary in view of this discrepancy between the testimony under which I originally allowed it.
>
> The recollection of some 11 minute period, yet, that it was the period and resolution today, this court will not and cannot in good conscience say I am satisfied beyond a reasonable doubt that the confession was voluntary.
>
> Accordingly, it will not be allowed in evidence.

We now consider whether the evidence in its totality can fairly raise a reasonable doubt that defendant's statement was given without coercion. Defendant's testimony that he was beaten and threatened with torture, if believed, would of course establish the involuntariness of his statement. Detective Miller may have testified falsely at the first *Miranda* hearing to give the false impression that before defendant gave the statement he was not in the officers' custody long enough for them to have beaten and threatened him. If Detective Miller's testimony was untrue for that reason, its falsity would corroborate defendant's story.

Defendant's testimony, even if not entirely credible, could generate a reasonable doubt as to the voluntariness of his statement. We are troubled, however, by the absence of any finding by the trial judge that defendant's testimony concerning his brutal treatment was at all credible. Indeed it may be surmised that the judge's acceptance of defendant's credibility did not extend beyond the truth of his testimony regarding the time when the detectives removed him from his cell. He said in

this regard, "[A] person may believe part of a witness' testimony and disbelieve part of it, I am satisfied and for the purpose of this hearing that Mr. Johnson was accurate when he said he was brought over." If defendant's testimony that he was beaten and tortured, when considered with all the evidence, was not sufficiently credible to raise at least a reasonable doubt that his statement was voluntary, the judge should not have suppressed the statement.

We do not mean, as our dissenting colleague says we mean, that a defendant has the burden of proving that his statement was involuntary. The dissent confuses the State's burden of proving voluntariness with its burden of proving guilt. The burdens are not identical. To discharge its burden of proving a defendant's guilt, the State must overcome the legal presumption of his innocence and must persuade the trier of fact beyond a reasonable doubt that he engaged in the specific criminal conduct with which he was charged. *United States v. Fiovaranti,* 412 *F.*2d 407, 418–419 (3rd Cir.1969), *cert.* den. *sub nom. Panaccione v. United States,* 396 *U.S.* 837, 90 *S.Ct.* 97, 24 *L.Ed.*2d 88 (1969).

There is no comparable presumption that a defendant's statement was given involuntarily. Once a State's witness testifies in general terms that the statement of a defendant was voluntary, to suppress that statement there must be some credible evidence that the police engaged in specific conduct that rendered the statement involuntary. The State cannot refute beyond a reasonable doubt nonexistent evidence of involuntariness. The requirement that the record contain some credible evidence that the police wrongfully engaged in specific conduct that broke the defendant's will does not saddle the defendant with the burden of proving that his confession was involuntary any more than the familiar requirement that the record of a trial contain some credible evidence of an affirmative defense saddles the defendant with the burden of proving his innocence. *See*

*State v. Humanik,* 199 *N.J.Super.* 283, 292–293 (App.Div.1985), certif. den. 101 *N.J.* 266 (1985) (proof of nonexistence of affirmative defense has never been constitutionally compelled).

■ If at the conclusion of a voluntariness hearing there is some credible evidence that the police wrongfully forced a defendant to confess, that evidence may engender a reasonable doubt that the confession was voluntarily given. If the judge has such a doubt, he must suppress the confession. To warrant suppressing the confession here, the trial judge must find that the falsity of Detective Miller's testimony at the first *Miranda* hearing infused a semblance of credibility into defendant's otherwise questionable testimony that he confessed as the result of police brutality. If, however, the trial judge gave no credence to defendant's testimony that the police forced him to confess, the judge erroneously suppressed the confession even though he did not believe some of Detective Miller's testimony.

We are also troubled by the absence of any finding as to what inference the judge drew from Detective Miller's untrue testimony. As we previously noted, the testimony may have been false because the detective simply forgot the time when he and Sergeant Whitner removed defendant from his cell and thoughtlessly yielded to the pressure of defense counsel's leading questions. That inference is strengthened by the candid reference in the detective's testimony to the cell-block log where positive proof could be found that his testimony was erroneous. On the other hand, the detective's testimony may have been false to cover up the fact that the detectives used force to obtain the statement. Ordinarily we would assume that a judge's unstated supporting findings were consistent with his ultimate finding but the trial judge said nothing to indicate that he understood that an inference could reasonably be drawn from Detective Miller's untrue testimony that would be consistent with the voluntariness of the statement.

That brings us to our third concern. Particular evidence may raise a reasonable doubt in the mind of a trier of fact that is

dispelled by other evidence. The trial judge said nothing to indicate that he had looked beyond Detective Miller's untrue testimony. He concluded simply that he had "a reasonable doubt that [defendant's] confession was voluntary in view of this discrepancy between the testimony under which I originally allowed it."

For instance, it is highly unlikely that defendant was testifying truthfully when he said that the detectives had prepared the statement in advance. If both detectives were constantly coercing him as he described, they would have had to prepare the three-page statement before they removed him from his cell. Thus both detectives would have had to be lying when they said that they did not know defendant was available to them until they saw his name on the 24–hour arrest sheet just before they left to pick him up. Also, the State offered to prove that the detectives would have had to know facts contained in the statement that they would not be expected to know unless those facts had been given to them by defendant. It appears from his questioning of defendant at the first *Miranda* hearing that the judge was impressed by this point, but at the second hearing he never mentioned it. Finally, the elaborate detail of events purportedly described by defendant in the statement and the detailed description of how he selected the photograph of Sylvester, whom defendant admitted he met in the New York half-way house named in the statement, tend to belie defendant's key testimony that the detectives fabricated the statement in advance.

We do not mean to suggest that a judge having a reasonable doubt must make the kind of findings that are expected when he is satisfied that there is no reasonable doubt of the voluntariness of a statement. When a trial judge is free of reasonable doubt on the question of voluntariness, he should make findings as to how the statement was given and explain away evidence that may have raised a reasonable doubt. *State v. Hodgson*, 44 *N.J.* 151, 160 (1965), *cert.* den. 384 *U.S.* 1021, 86

*S.Ct.* 1929, 16 *L.Ed.*2d 1022 (1966). But when a judge has a reasonable doubt that a statement is voluntary, he does not have to make findings as to how the statement was given—he may not be able to say how the statement was given. The judge should, however, articulate the evidential basis of his doubt, relate that evidence to the voluntariness of the statement and say enough to indicate that he considered all the evidence, particularly the major evidence that could dispel his doubt. *See, e.g., State v. Davis,* 380 *So.*2d 607, 609–610 (La. 1980); *People v. Brown,* 96 *Misc.*2d 244, 408 *N.Y.S.*2d 1007 (Co.Ct.1978); *United States v. Schipani,* 289 *F.Supp.* 43, 60–61 (E.D.N.Y.1968). That was not done here.

We can say with assurance that the trial judge did not consider all the evidence that could have dispelled his doubt because he excluded some such evidence. The State should have been permitted to prove that defendant's statement referred to facts that the detectives could not have known. The judge excluded the evidence because he mistakenly believed that it was offered to prove the truth of defendant's statement. In that regard, the judge correctly concluded that if the statement was involuntary, it is inadmissible regardless of its truth. The evidence was not being offered to prove the truth of the statement, however, but the falsity of defendant's testimony that the detectives had made up the statement without having obtained any facts from him. Defendant's credibility was relevant to the ultimate issue of voluntariness. Even if Detective Miller's credibility was impaired, there can be no substance to defendant's claim of beating and torture unless defendant's credibility is also evaluated.

We sense in this record that the trial judge was not only understandably affronted by the State's false evidence at the first *Miranda* hearing but that his sense of outrage, however justified, may impair his ability to reconsider his prior findings. We therefore believe it best that on remand there be a new *Miranda* hearing by a new fact-finder. *See New Jersey Div. of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 617 (1986).

The order suppressing defendant's statement is reversed. The matter is remanded for further proceedings in accordance with this opinion.

D'ANNUNZIO, J.S.C. (temporarily assigned) (dissenting).

Essex County Indictment No. 728–2–85 charged defendant with murder in violation of *N.J.S.A.* 2C:11–3a.(1), (2) and possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4a. The charges arose out of the murder of Arthur Lytle on August 26, 1984. It was the theory of the State's case that the murder resulted from a drug trafficking dispute involving defendant, a codefendant and the victim. The indictment was tried in November 1985 and the jury returned a verdict of guilty of both charges.

Immediately prior to trial the court held a hearing to determine the admissibility of defendant's confession. The State's only witness at the hearing was Detective Miller. Miller testified that defendant became a suspect in the homicide shortly after the police began their investigation. However, defendant could not be located until Christmas day, 1984, when Miller and his partner, Detective Whitner, noticed defendant's name on the daily jail list. According to Miller, he and Whitner removed defendant from the jail at 12:30 p.m. and took him to the office of the homicide squad for questioning. Miller testified that defendant was advised of his *Miranda* rights and signed a *Miranda* card at 12:39 p.m., that defendant commenced giving his confession to the police eleven minutes later at 12:50 p.m., that no coercion was used, that defendant gave the statement voluntarily and that defendant did not ask for a lawyer.

Defendant's version was different. He testified that he was released from the jail to the detectives' custody at approximately 10:00 a.m. and that he signed the statement only after he had been subjected to two hours of physical and emotional abuse. The trial judge ruled that defendant's confession was admissi-

ble. At trial, the confession was the State's most important evidence.

Before sentencing, defense counsel moved for a new trial based on newly discovered evidence consisting of a cell block movement sheet which established that defendant was removed from the cell block by the police at 10:05 a.m. and not at 12:30 p.m. The jail record corroborated defendant's version regarding the timing of his Christmas day interrogation and established a 2½ hour gap between defendant's release to the detectives' custody and the time he signed the *Miranda* card. Defendant's motion for a new trial was granted. The State has not sought leave to appeal that order. Therefore it is not before us on this appeal.

In July 1986, a second *Miranda* hearing was held.[1] Detectives Whitner and Miller testified and the parties also relied upon a transcript of the testimony of Miller and defendant at the first *Miranda* hearing.

At the second hearing, Detectives Whitner and Miller acknowledged that Johnson had been taken from the jail at approximately 10:00 a.m. Miller explained that his prior testimony was the result of an error. Both detectives testified that between 10:30 a.m. and 12:30 p.m. they engaged in general discussions with defendant about the Lytle murder and other unsolved murders and that they were preoccupied with other police business because they were the only detectives on duty Christmas day.

The trial judge ruled the confession inadmissible. In his decision he referred to Miller's testimony during the first *Miranda* hearing that defendant had been brought to the homicide squad just before he was read his *Miranda* rights, that the *first* thing they did was advise him of his *Miranda* rights, that this occurred at 12:30, that defendant signed the *Miranda* card at 12:39, that they did not discuss the Lytle

---

[1] The same trial judge was involved in all these proceedings.

murder with defendant until *after* he signed the *Miranda* card and that they did not bring him to their office earlier than 12:30 p.m. that day. The trial judge found that Johnson's testimony was accurate regarding the time he was removed from the jail and brought to the homicide squad. But the judge admitted that he was not sure what had occurred between 10:30 a.m. and 12:30 p.m. After noting that the burden of proof was on the State to establish that the confession was voluntary, the judge stated that he was not satisfied beyond a reasonable doubt that the confession was voluntary "in view of this discrepancy between the testimony under which I originally allowed it."

A confession is not admissible unless it is voluntary. *Jackson v. Denno*, 378 *U.S.* 368, 84 *S.Ct.* 1774, 12 *L.Ed.*2d 908 (1964). The burden of proof is on the State to establish voluntariness beyond a reasonable doubt. *State v. Yough*, 49 *N.J.* 587, 601 (1967); *State v. Kelly*, 61 *N.J.* 283, 294 (1972). The State contends that the trial judge failed to consider the totality of the circumstances under which the defendant's statement was obtained, *see State v. Miller*, 76 *N.J.* 392 (1978)[2], including whether defendant was advised of and understood his rights and whether he waived them. The State further contends that the trial court made no findings as to defendant's education and intelligence, defendant's physical and mental state and whether there was evidence of physical and mental abuse. The State also focuses on defendant's testimony that the police prepared the statement for him to sign without his cooperation. According to the State, the statement defendant signed contained information the police would not have had unless the defendant gave it to them.

I agree that the trial judge focused on the inconsistency between Miller's testimony at the first hearing and the facts as later established. Consequently, he did not engage in an analy-

[2]Subsequent history, on a petition for writ of *habeas corpus*, is found in *Miller v. Fenton*, 741 *F.*2d 1456 (3 Cir.1984), reversed and remanded 474 U.S. 104, 106 S.Ct. 445, 88 *L.Ed.*2d 405 (1985).

sis of the evidence as it related to all factual issues. However, since the burden of proof was on the State, a fuller analysis of the evidence by the trial judge would not have dispelled his doubts about what had occurred from 10:30 a.m. until 12:30 p.m. In his decision suppressing defendant's statement, the judge highlighted Miller's testimony given at the first hearing that immediately upon arrival at the squad office the detectives advised the defendant of his rights and had him sign the *Miranda* card. Miller also testified that they had not discussed the case with defendant until after defendant signed the card at 12:39 p.m. At the first hearing, Miller agreed that they began to prepare defendant's statement only 11 minutes after they began to talk with the defendant and denied that they had brought defendant from the jail two or three hours earlier.

Upon consideration of these major inconsistencies between Miller's testimony and fact the trial judge was unable to make a finding as to what had occurred during the two hour gap. If he had upheld the admissibility of defendant's statement, specific findings would have been necessary. However, since the burden of proof was on the State, specific findings were unnecessary to support suppression of the statement. Defendant had no burden to establish what actually had occurred.

Miller's initial denial of the time gap seriously impaired his credibility. The impact of the existence of the time gap was exacerbated because it was consistent with defendant's version that he had been physically and emotionally abused for two hours before he succumbed to the police pressure. Defendant's version was also consistent with the established fact that no *Miranda* card was signed by the defendant until 12:39 p.m., more than two hours after he had been removed from the jail. In this case the trial court's doubt is reasonably grounded in the testimony and the evidence before it and I would affirm.

Obviously troubled by the grant of a new trial, an issue which is not before us, and by the suppression of what may be the only evidence sufficient to convict the defendant, my col-

leagues reach a different conclusion. But to do so, they had to shift the burden of proof to the defendant. This is demonstrated by the following passage from the majority opinion:

> We are troubled, however, by the absence of any finding by the trial judge that defendant's testimony concerning his treatment was at all credible ... if defendant's testimony that he was beaten and tortured, when considered with all the evidence, was not sufficiently credible to raise at least a reasonable doubt that his statement was voluntary, the judge should not have suppressed the statement.

The majority also note that Miller's "untrue" testimony could support two alternative inferences—that Miller had an innocent memory lapse or that Miller deliberately lied. The majority concede that the second inference would render the statement involuntary. However, the majority would require the trial judge to make a *finding* as to which inference he is drawing.

In my view, the trial judge is not required to make a specific finding. The fact that the evidence would support an inference which would require suppression is a sufficient basis upon which to ground a reasonable doubt if the trial judge is not satisfied that he can draw the inference that is consistent with a voluntary confession. After all, the essence of reasonable doubt is honest and reasonable *uncertainty*. *State v. Lane*, 52 *N.J.* 123 (1968); *State v. Sherwin*, 127 *N.J.Super.* 370 (App.Div. 1974), certif. den. 65 *N.J.* 569 (1974), *cert.* dismissed *sub nom. Loughman v. New Jersey*, 419 *U.S.* 801, 95 *S.Ct.* 9, 42 *L.Ed.*2d 32 (1974). Of course, to support a conclusion that the confession was voluntary the trial judge would have been required to find that Miller's untrue testimony was the result of innocent memory lapse. By suggesting that the trial court's decision in this case cannot stand in the absence of a specific finding that Miller's testimony was willfully false the majority shift the burden of persuasion to the defendant.

As further support for a remand, the majority conclude that "it is highly unlikely that defendant was testifying truthfully when he said that the detectives had prepared the statement in advance." The majority criticize the trial judge for not mentioning this defect in defendant's credibility in his opinion at the

second *Miranda* hearing. Thus it is suggested that the trial judge did not consider "all the evidence that could have dispelled his doubt...."

I disagree with the majority's evaluation of the judge's decision. Although his opinion is not a model of clarity, it is apparent that the trial judge agreed with the assistant prosecutor's summation argument that defendant was lying when defendant testified that he gave the police no information but merely signed the document that was put in front of him. In an obvious reference to the fact that defendant first met his alleged cohort, Sylvester Johnson, in a New York Correctional Center, a fact apparently unknown to the police when defendant signed his statement, the trial judge interrupted the prosecutor's summation stating:

> I think I should point out it was at the original hearing and, therefore, they [the police] wouldn't have known he was in the same correctional facility linking him with the others. [July 7, 1986 transcript at page 63]

Moreover, the fact that defendant lied when he denied giving the police the information set forth in the signed statement does not establish that the statement was voluntary. The burden of proof to establish voluntariness remained at all times on the State. The record reflects untruths by Johnson and untruths by Miller. Miller's untruths were more significant to the trier of fact than defendant's untruths because the State had the burden of proof.

Contrary to the impression created by the majority through their reference to a limited excerpt from the trial judge's opinion, the trial judge did not limit his consideration to the time gap alone. The judge made extensive references to Miller's testimony that the first thing they did was advise defendant of his *Miranda* rights and that they did not discuss the Lytle murder until after the defendant signed the *Miranda* card.

Finally, I perceive no basis for removal of the trial judge from this case. There is no evidence of bias or partiality for or against the defendant or the State. The record establishes that

an experienced trial judge was conscientiously fulfilling his constitutional responsibility. Though another trial judge may have drawn inferences consistent with a voluntary confession, the reasonable doubt expressed by this trial judge was sufficiently grounded in the record. Replacement of a trial judge because he has acted reasonably in the protection of a defendant's constitutional rights sets a disturbing precedent and transmits the wrong message to trial judges, the police and the public.